NEAL HOWARD ROSENBERG (NR7827)
MICHAEL MASTRANGELO (MM1433)
ATTORNEY FOR PLAINTIFFS
111 JOHN STREET, 22ND FLOOR
NEW YORK, NY 10038
TEL: (212) 732-9450

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X

N.K.M. and M.M., on behalf of G.M., a minor child
                              Plaintiffs-Appellants,

                                                                    23 CV 01109

            -against-


The Rye City School District,
                              Defendant-Appellee.
-----------------------------------------X

---

### PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT

---

For the reasons set forth in Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Declaration of Neal H. Rosenberg in Support of Plaintiff's Motion for Summary Judgment, and the exhibits attached thereto, Plaintiffs respectfully request that the Court enter an Order granting summary judgment pursuant to Fed. R. Civ. P. 56 that the Defendant failed to offer GM. a Free and Appropriate Public Education, that the Parents' unilateral placement was appropriate, and that the equities support Plaintiffs' claim to tuition reimbursement for the 2020-2021 and 2021-2022 school years.

Law Offices of Neal H. Rosenberg
Attorneys for the Plaintiffs-Appellants
111 John Street, 22nd Floor
New York, New York 10038

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STANDARD OF REVIEW ........................................................................................................2

QUESTIONS PRESENTED.........................................................................................................2

ARGUMENT ..............................................................................................................................2

  Point 1 – THE SRO INCORRECTLY FOUND THAT THE DEFENDANT OFFERED GM A
FAPE FOR THE 2020-2021 AND 2021-2022 SCHOOL YEARS .............................................2

  POINT 2 – WINDWARD'S PROGRAM APPROPRIATELY MET GM'S SPECIAL NEEDS
FOR THE 2020-2021 AND 2021-2022 SCHOOL YEARS....................................................19

  POINT 3- EQUITABLE CONSIDERATIONS SUPPORT THE PARENTS' REQUEST FOR
RELIEF ..................................................................................................................................24

CONCLUSION……………………………………………………………………………………..25

<u>TABLE OF AUTHORITIES</u>

**Cases**

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)............................................ 2

Crimmins v. Dennison, 815 N.Y.S.2d 400 (2006)...................................................................... 2

Endrew F. v. Douglas County School Dist. Re-1, 580 U.S. (2017)............................................ 8

Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 364-65 (2d Cir. 2006) ...................... 19

Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007) ............................... 19

M.H. v. New York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir.2012)........................... 1, 2

McKinney v. Bennett, 2006 N.Y. Slip Op. 05274 9, N.Y. App.Div.3d Dept., 2006.................... 2

Mr. P. v. W. Hartford Bg. Of Educ., 885 F.3d 735, 753 (2d Cir. 2018) ...................................... 5

R.E. v. N.Y. City Dep't of Educ., 694 F.3d 167, 174–75 (2d Cir.2012) .......................... 1

Rowley, 458 U.S. 176, 206-07 (1982);............................................................................... 2, 24

Schaffer v. Weast, 546 U.S. 49, 53 (2005) ........................................................................ 24

T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir.2009) 1

Walczak v. Florida Union Free Sch. Dist.,142 F.3d 119, 129 (2d Cir.1998).............................. 2

Watson v. Kingston City Sch. Dist., 325 F. Supp 2d 141, 145 (N.D.N.Y. 2004)......................... 5

**Statutes**

20 U.S.C. § 1415(i)(2)(a)................................................................................................. 1

34 CFR 300.324[a]......................................................................................................... 4

8 NYCRR 200.5[g][1][vi]................................................................................................ 4

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Plaintiff G.M. ("Student"), by his parents, N.K. and M.M. ("Parents"), through their Attorneys Neal Howard Rosenberg, Esq. and Michael Mastrangelo, Esq., sue the Defendant, the Rye City School District ("District") as follows.  The proceeding is an appeal pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(a), from a final decision of Steven Krolak, the New York State Review Officer (the "SRO"), dated November 10, 2022.

Relief is requested because, as is more fully set forth herein, the SRO's decision is in violation of the IDEA and the laws of the State of New York, which require that children with disabilities receive a Free and Appropriate Public Education ("FAPE").

STANDARD OF REVIEW

The "responsibility for determining whether a challenged IEP will provide a child with [a FAPE] rests in the first instance with administrative hearing and review officers." M.H. v. New York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir.2012). Summary judgment in the IDEA context, therefore, is only a "pragmatic procedural mechanism for reviewing administrative decisions." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir.2009) (per curiam) (internal quotation marks and citation omitted).  This review "requires a more critical appraisal of the agency determination than clear-error review" but "falls well short of complete *de novo* review." M.H., 685 F.3d at 244 (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086–87 (1st Cir.1993) (internal citations omitted)).  Accordingly, the Court's *de novo* review should seek to independently determine whether the administrative record supports the SRO's determinations. See R.E. v. N.Y. City Dep't of Educ., 694 F.3d 167,

174–75  (2d Cir.2012), 694 F.3d at 184.

District courts are not expected to merely "rubber stamp" all SRO decisions.  <u>M.H.</u>, 685 F.3d at 240.  Where the SRO departs from the well-reasoned decision of an IHO, the Court must consider whether the SRO's review "has been thorough and careful."  <u>Walczak v. Florida Union Free Sch. Dist.,142 F.3d 119</u>, 129 (2d Cir.1998).  This is particularly true with respect to issues of witness credibility; as the initial finder of fact, the IHO is in a unique position to assess witness credibility and balance conflicting evidence.  <u>McKinney v. Bennett</u>, 2006 N.Y. Slip Op. 05274 9, N.Y. App.Div.3d Dept., 2006; <u>see also</u>, <u>Crimmins v. Dennison</u>, 815 N.Y.S.2d 400 (2006).

## QUESTIONS PRESENTED

I)      Did the SRO err in finding that Defendant offered GM a FAPE for the 2020-2021 and 2021-2022 school years?

II)     Was the Parents' unilateral placement at The Windward School appropriate to meet GM's special education needs?

III)    Do the equitable circumstances of the case support Plaintiff's claim to tuition reimbursement?

## ARGUMENT

### POINT I: THE SRO INCORRECTLY FOUND THAT THE DEFENDANT OFFERED GM A FAPE FOR THE 2020-2021 AND 2021-2022 SCHOOL YEARS

A.  The District failed to provide GM a FAPE for the 2020-2021 school year because the recommended program did not address all of GM's learning deficits as outlined in the evaluative material and reports available to the CSE.

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the Student to receive educational benefits. <u>Rowley</u>, 458 U.S. 176, 206-07 (1982); <u>Cerra v. Pawling Cent.  Sch. Dist.,</u> 427 F.3d

2

186, 192 (2d Cir. 2005). In the instant matter, each of the IEPs prepared by the District for the 2020-2021 and the 2021- 2022 school years are substantively and procedurally inappropriate, inadequate, and not reasonably calculated to offer the Student an opportunity to make academic, social or emotional progress. Moreover, the procedural inadequacies in the development of the Student's IEPs impeded the Student's right to a FAPE, significantly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, and caused a deprivation of educational benefits.

For the 2021-2022 school year, the CSE recommended that GM be placed in a general education setting with the support of integrated co-teaching services for language arts and math. The CSE recommended that GM receive speech/language therapy, specialized reading instruction and social skills class. The proposed program was not reasonably calculated to enable GM to receive meaningful educational benefit as an ICT class for language arts and math and general education classes for social studies and science were inappropriate for GM.

In relevant part, the earliest report relevant to the school years at issue in this case was Dr. Dietrich's report resulting from her August 2017 neuropsychological evaluation. While the report was not considered during either the June 2020 CSE meeting or the April 2021 CSE meeting, as acknowledged by the District during its testimony (although the findings were included in the 2020 IEP), it provides important contextual information about GM's learning deficits across all educational domains

For example, "[GM's] Oral Reading Fluency on the WIAT-III is below the first percentile, consistent with learning disability." Ex. 4-15. "The speed of reading pseudowords has been seen in the literature to differentiate good from poor readers and reveals underlying phonological deficits operating on subword processes (i.e. the application of phonics rules to

recognize written words). There is usually a high correlation between pseudoword naming and reading attack skills. Stanovich (2000) has found pseudoword reading to be a 'potent predictor of reading ability at all levels'." GM's Pseudoword Reading Speed was at the second percentile. Ex.4-15. GM scored in the second percentile and fifth percentiles in the areas of speed of processing sounds and rapid naming of visuals. These tests measured GM's ability to process both visual and phonological information and correlate with reading speed and fluency. The results established that GM's auditory-visual connections are weak. Ex.4-16. GM also tested within the first percentile of reading comprehension. Ex.4-17.

In developing the recommendations for a student's IEP, the CSE must consider the results of the initial or most recent evaluation; the student's strengths; the concerns of the parents for enhancing the education of the child; the academic, developmental, and functional needs of the student, including, as appropriate, the student's performance on any general State or district-wide assessments as well as any special factors as set forth in federal and State regulations (34 CFR 300.324[a]; 8 NYCRR 200.5[g][1][vi]). . Here, the CSE completely neglected a 2017 private neuropsychological evaluation conducted by Dr. Jeanne Dietrich (Ex. 4) in developing the IEP and in making its recommendations. This failure led the CSE to develop an IEP that did not sufficiently address GM's learning deficits.

As a result of these findings, Dr. Dietrich recommended that GM needed a school which "specializes in the education of children of at least average intelligence with a language-based learning disability." Ex.4-19. She further recommended, due to the barriers to reading symptomatic of dyslexia, GM needs "a program such as Orton-Gillingham, an evidence-based curriculum which has been demonstrated to be more effective with the child struggling with sound-symbol correspondence than traditional curricula. A multi-sensory based curriculum utilizes the three

learning modalities through which people learn – visual, auditory and kinesthetic. Multi-sensory instruction is a structured, intensive, sequential phonics-based system which teaches the basics of word formation. The approach stresses sequential and cumulative acquisition of phonemic principles. It teaches to the student's strengths, while seeking to improve his weaknesses. Due to the degree of delay, particularly in light of his intelligence, [GM] needs this type of instruction throughout the school day." Ex.4-19.

Furthermore, Dr. Dietrich's evaluation led to a diagnosis of Specific Learning Disability with impairment in mathematics and included testing scores which made this impairment evident.[1] Ex. 4. The hearing record makes clear that the CSE did not consider these scores during the CSE meeting and did not sufficiently consider GM's math deficits when making its recommendations or developing its IEP.

The SRO noted that "consideration does not require substantive discussion, or that every member of the CSE read the document, or that the CSE afford the private evaluation any particular weight or adopt their recommendations (Mr. P. v. W. Hartford Bg. Of Educ., 885 F.3d 735, 753 (2d Cir. 2018)], citing T.S. v. Ridgefield Bd. Of Educ., 10F.3d 87, 89-90 (2d Cir. 1993)]; Watson v. Kingston City Sch. Dist., 325 F. Supp 2d 141, 145 (N.D.N.Y. 2004) [noting that even if a district relies on a privately obtained evaluation to determine a student's levels of functional performance, it need not adopt wholesale the ultimate recommendations by the private evaluator. A1 at pp. 13.

Here, the District failed to even rely on the evaluation to determine all of GM's levels of

---

[1] GM scored within the 14th percentile on the Woodcock-Johnson IV-Tests of Achievement Broad Mathematics measure of math achievement per a 2018 District Educational Evaluation. Ex.7-3. This score also includes GM's performance in the fourth percentile in the Applied Problems subtest which measured GM's ability to analyze and solve math problems that are presented orally. It was noted that GM was unable to answer any word problems.Ex.7-3.

functional performance. Yet, the SRO incorrectly determined that the CSE's failure to consider the 2017 neuropsychological evaluation did not matter because the CSE chairperson prepared the June 2020 IEP in collaboration with the Windward liaison, the private speech-language pathologist, the parents and the district special education teacher. The SRO noted that the CSE "heavily relied" on Windward staff feedback, parent feedback, and the private speech-language pathologist's feedback since they were working directly with the Student (A1 at pp.14).

The record demonstrates that, even though, the CSE "heavily relied" on Windward staff feedback, this feedback was given little to no weight by the CSE. For example, Amy Oosoli's ("Ms. Oosoli") testimony establishes that the CSE considered Windward's description of GM's then-present levels of performance in math, but the record is clear that this consideration did not result in a program that was appropriate to address GM's deficits in math. During the June 2020 CSE meeting, Lara Damashek ("Ms. Damashek"), Windward's CSE liaison, noted that GM "benefits from the slower pace" of his math class which "typically covered a topic over the course of several days and breaks down all of the language to meet the needs of the group." Ex.23-5.

Ms. Osooli failed to provide any testimony that an ICT class would allow for this type of instructional pacing or attention to breaking down the language of math problems. Further, the IEP fails to include any reference to modifying instructional pacing or breaking down language within math (an essential strategy for GM, a student with language deficits that impact his ability to access the math curriculum). Ex.11. Ms. Damashek noted that GM needed support with multidigit multiplication and long division and teacher support with problem solving. Ex.23-5. However, neither the IEP nor Ms. Osooli's testimony made clear how an ICT program would have provided such support or remediated GM's math deficits.

Further, during the June 2020 CSE meeting, Ms. Damashek explained that GM's math group was a "low grade level but they followed the GO! Math sequence for fourth grade" and they proceed through the curriculum "in less steps and modified when needed". Ex.23-5. The CSE did not request any information from Ms. Damashek about what those modifications were in order to inform their decision-making regarding program recommendation. Ex.23. Similarly, the CSE failed to obtain crucial information in the following areas: the student to teacher ratio in GM's math class, the specific math instructional strategies used by Windward teaching staff to address GM's math deficits, the purpose of GM's weekly 1:1 tutoring or how it was implemented, specific information about GM's grade level performance in math, and the impact of GM's diagnosed specific learning disability with impairment in math on GM's math progress. T.94-96.

As such, the recommendation of an ICT program was made without sufficiently understanding GM's learning needs and the instructional strategies that were addressing those learning needs at Windward.

Furthermore, there was no discussion at the CSE meeting about the results of standardized testing that was completed as part of educational evaluations by both the District (Ex. 7) and Dr. Dietrich (Ex. 4) which indicated GM's specific math deficits. T.111-114. Although the quantitative results of the testing was included in the IEP, Ms. Osooli acknowledged that the testing was not considered in developing the IEP. T.111.And, Ms. Osooli admitted that she had never reviewed the 2017 evaluation conducted by Dr. Dietrich prior to the CSE meeting or during the CSE meeting.T.94 The first time that she saw the evaluation was during the hearing. T.94. All in all, the CSE's understanding of GM's math deficits and how those deficits could be addressed in its educational program were not sufficiently considered.

In fact, Ms. Osooli admitted that she was unaware of GM's math learning disability diagnosis altogether and that the IEP failed to make note of it. T.90-93. Consequently, the CSE recommended a program that was not reasonably calculated to enable GM to make meaningful progress.

The CSE recommended ICT for math at a frequency of one hour per day. Ex.11-1. The CSE did not offer any other remediation, small group support or specialized instruction despite GM's significant math deficits. Ex.11-1. Instead, the CSE recommended a large, general education class that would have been unable to address GM's math deficits and allow for attainment of the annual goals that were included in the IEP. Ms. Osooli's testimony, in an effort to justify placement in an ICT class, was unconvincing, vague and not responsive to GM's learning needs. Rather, she focused on the three math goals that were developed for GM and broadly stated than ICT program would be able to address those goals without any other additional support. T.100-102. For these reasons, the IEP developed for the 2020-2021 school year was not reasonably calculated to enable GM to make progress in math and therefore deprived him of a FAPE.

The SRO's decision fails to provide sufficient reasoning as to why the ICT program, with no additional support in the area of math, was appropriate to address GM's math deficits. The SRO's rationale relied on the generalized and vague statements of the District witnesses, noting that "the supervisor testified that she believed that ICT services were appropriate for the student and would have enabled him to meet his anfonual goals. (Tr. pp. 62-63)." And, the SRO's decision failed to hold the District to the "cogent and responsive explanation" standard outlined in Endrew F. v. Douglas County School Dist. Re-1, 580 U.S. (2017).

Further, the District's program fails to provide necessary specialized instruction for

students with language-based learning disabilities throughout the school day. In her decision, the IHO noted that Dr. Dietrich recommended placement in "a school which specializes in the education of children of at least average intelligence with a language-based disability" and that he receive "a program such as Orton-Gillingham". Dec. at 35. Furthermore, the IHO placed importance on the recommendation that "due to the degree of delay, particularly in light of his intelligence, [GM] needs this type of instruction throughout the school day. Dec. at 35. The record establishes that GM required a language-based curriculum throughout the day in all content areas and required the Orton-Gillingham program since it is systematic and repetitive and has a good foundation in language and phonological awareness skills. Dec. at 36. The IHO took issue with the fact that the District's specialized reading instruction would have occurred only "during his one hour of reading instruction" and the District's testimony provided little information about the specific nature of the "combination of reading instructional approaches during the specialized reading instruction period." Tr. 122-123 Ultimately, the IHO properly determined that, given GM's significant deficits in reading and writing at the time of the June 2020 CSE meeting, the District's recommended program could not sufficiently remediate these deficits and enable him to make progress.[22] Tr. 122-123, Dec. at 35.

The SRO improperly determined that the District's program would have appropriately remediated the Student's language-based learning disability citing that the District is not required to specify a particular type of methodology and that an ICT program in language arts and one hour of specialized reading instruction was sufficient. Ex.A1 at pp.23. However, this

---

[2] The District incorrectly argues that GM presented with average decoding skills at the time of the 2020 CSE meeting. The IEP notes that GM was performing at a third grade reading level at the time of the CSE meeting, a full grade below and the Parent raised concerns about GM's decoding abilities during the meeting. Ex.11 at 2, 16. Additionally, the IEP includes a decoding goal, reinforcing the fact that one of GM's primary deficits was in the area of decoding. Ex. 11 at 9.

determination misconstrues one of the key arguments made by the Parents and determined by the IHO – that GM required specialized reading instruction embedded into each content area in order to access the general education texts, not just that a specific methodology was required. Contrary to the SRO's finding, the IHO's analysis carefully considered the entirety of the District's program which consisted of an ICT class for math and language arts, a general education class for science and social studies, speech/language therapy and social skills. She found that this program would not have addressed all of GM's learning needs as "he needed language integration throughout the day and needed small group instruction." Tr. 43, 45; Dec. at 36. The IHO, citing Ms. Osooli's testimony pointed out that there would be two teachers, a general education and special education teacher for language arts and math and the class size range would be 23 to 26 kids. She also highlighted the fact that the other classes would be general education classes where there would only be a general education teacher. Dec. at 36. Ultimately, this program was not in line with all of GM's learning needs. And, the District's testimony failed to establish how GM's language- based learning needs would be addressed in a program that consisted of placement in a general education class for the majority of the school day with minimal time dedicated to remediation. The District also failed to establish that the recommended general education classes for science and social studies were appropriate. The SRO did not address this issue at all and only focused on the appropriateness of the ICT classes for math and language arts.

Additionally, the SRO gave undue weight to Ms. Osooli's testimony as compared to the Parents' witnesses and evidence in finding that District's program was appropriate. Instead of providing sufficient testimony to meet its burden at hearing, Ms. Osooli, the District's only witness testifying about the 2020-2021 school year, provided only vague and broad statements

about the efficacy of an ICT class and could not speak with any level of specificity about how the District elementary school would implement the IEP for GM. When asked about the ICT class, she made statements about ICT classes in general such as the size - that an ICT class can range from twenty-three students up to twenty-six students. T.63. She testified that the district cannot have more than forty percent of students with IEPs in the classrooms. T.63. When asked whether the ICT class was appropriate for GM she confirmed that she believed it was appropriate noting "it's really nice 'cause it can meet with all learners. It allows for small-group instruction. It can allow for individual instruction. It's based on needs and each student's plan. So it really can be differentiated so that students can thrive in that setting." However, she did not provide testimony about how the program was aligned to GM's learning needs.

The SRO improperly relied on this testimony to find that the 2020-2021 IEP was appropriate. The SRO's decision referenced Ms. Osooli's general statements about the appropriateness of the ICT class for GM multiple times even though her testimony primarily explained how ICT classes were generally delivered and did not describe how GM's specific learning needs would be addressed. Ex.A1 at pp.21. In effect, the SRO's decision was improper because it excessively relied on one witness's vague testimony rather than taking sufficient consideration of the record as a whole.

For the foregoing reasons, the District failed to offer GM a FAPE For the 2021-2022 school year.

B. The District failed to offer GM a FAPE for the 2021-2022 school year because the ICT recommendation for all content areas along with a 15:1 educational support class did not provide sufficient support for GM in light of his learning deficits.

For the 2021-2022 school year, the CSE recommended that GM receive daily ICT services for language arts, math, social studies and science; one 40-minute session per day of an

educational support class in a group of 15; two 30-minute sessions per week of individual speech-language therapy; one 30-minute session per week of speech-language therapy in a group of five; and one 30-minute session per week of both individual an small group (5:1) counseling. Ex. 21 at pp. 1, 3,

14). Notably, the District determined that GM needed ICT services for all content areas for the 2021-2022 school year, in contrast to the 2020-2021 school year wherein ICT was only recommended for math and language arts. The IHO properly determined that this program did not offer GM a FAPE and the SRO improperly reversed that decision.

As a preliminary matter, the District failed to meet its burden of proof. The District's witnesses, Joanna Diaco ("Ms. Diaco"), Lisa Needleman ("Ms. Needleman") and Devin Natale ("Ms. Natale") fell short of providing concrete testimony about how the IEP addressed GM's learning needs and, as none of them worked within the middle school, they were unable to provide the necessary testimony to meet the District's burden of proof to establish how the middle school would have implemented the IEP.

At the April 2021 CSE meeting, the CSE allegedly reviewed the results of a private evaluation conducted by Dr. Dianne Newman (Ex.15 and IHO Ex.1), a District educational evaluation conducted by Ms. Needleman (Ex. 18) and a District speech/language evaluation (Ex.17) conducted by Ms. Natale.

The evaluative material considered[3] at the CSE meeting established GM's continued deficit areas in reading, writing and math. For example, GM's WIAT-III testing indicated performance within the fourth percentile in math and within the 0.4 percentile in math fluency.

---

[3] Ms. Needleman testified that the IEP only included evaluative data that was discussed at the meeting and that prior testing data was not included in the IEP because it had not been discussed. T.181. This testimony conflicts with the IEP from June 2020 that included prior testing that was not discussed at the June 2020 CSE meeting as acknowledged by Ms. Osooli during her testimony.

Ex.18-2. The subtests within that assessment indicated deficit areas (below average, low, or very low functioning) in Reading Comprehension, Math Problem Solving, Written Expression, Numerical Operations, Math Fluency, and Essay Composition. Ex.18-2. Further, on the District's Woodcock Reading Mastery Test-III, GM scored below average in word comprehension, passage comprehension, and in the reading comprehension cluster. Ex.18-5. These deficit areas continue to be attributable to GM's specific learning disability diagnoses in reading, math and writing and continue to call for reading and math remediation.

Dr. Newman's evaluation rendered similar findings with regard to GM's deficit areas. Dr. Newman, during her testimony, noted that GM's reading comprehension and fluency skills were all low. On the Woodcock-Johnson IV Tests of Achievement, GM scored below his expected grade equivalency in all areas. And, the most notable deficit areas were in reading comprehension, made

up of passage comprehension and reading recall subtests; reading rate; broad mathematics; math calculation skills and math problem solving. Ex.15-14. With regard to reading comprehension, Dr. Newman, in her report noted that tasks requiring reading comprehension skills above the 2.8 grade level will be difficult for him. Ex.15-16, T.453-454. She explained that given GM's reading comprehension challenges, his curriculum level or where you would teach a student with GM's reading comprehension deficits would be within the 1.5 to 2.8 grade level equivalent. T.454.

Throughout Dr. Newman's testing, she noted the curriculum range within which it would be appropriate to instruct GM. Each area tested was below sixth grade level, with the exception of basic reading skills. Ex. 15-15,16,17,18,19,20. As a result of Dr. Newman's testing she diagnosed GM with: Language Disorder; Specific Learning Disorder with impairment in

mathematics; Specific Learning Disorder with impairment in reading; and Specific Learning Disorder with impairment in Written Expression. She also acknowledged a prior diagnosis of Disruptive Mood Disorder.[4] Dr. Newman recommended that GM continue "placement in a small, structured, supportive full-time special education classroom within a small full-time special education school...GM should continue to be provided with a multi-sensory instructional program that incorporates strategies and skill acquisition throughout the day…Structured Literacy instruction is systematic and cumulative, uses explicit instruction, and uses diagnostic teaching/individualized instruction.[5] [5]" Ex. 15-33.

Despite the District's review of GM's significant learning deficits indicated in the evaluative material available to it, hearing from Windward's representative regarding GM's need for a language-based learning program and the noted significant deficits in the District educational evaluation, the CSE recommended continued placement in a large, general education ICT class for all content areas. Furthermore, the CSE did not recommend specialized reading and instead recommended a 15:1 educational support class. This program deprived GM of a FAPE as he would not have received the appropriate level of instruction or type of reading methodology that would have enabled him to make progress in light of his reading, writing and math deficits.

Similar to the testimony provided to justify the appropriateness of the 2020-2021 IEP,

---

[4] The record makes clear that GM did not demonstrate any social-emotional challenges in school at Windward and therefore there was no identified need for counseling or emotional support within Windward's setting.

[5] Dr. Newman had drafted an initial recommendation that indicated continued placement at Windward (IHO Ex.1), however, the Parents requested that she modify that recommendation so as not to recommend a particular school that Rye was unable to recommend, but a general statement about what GM needed in terms of educational placement. T.511, 898-900. It is important to note that only that recommendation was modified and nothing else in the final version of the evaluation report was different from the initial draft. Compare IHO Ex.1 and Ex.15.

the District's testimony failed to provide a cogent and responsive rationale to explain the CSE's reasoning for recommending the program it did for the 2021-2022 school year.

The SRO improperly determined that the ICT program was appropriate for GM as his reasoning neglected to consider all of GM's learning needs and the need for a more supportive program. Further, he relied too heavily on testimony from witnesses who were unable to provide specific and concrete information about how the ICT program would address GM's learning needs. For example, Ms. Needleman conducted the educational evaluation that was discussed at the CSE meeting. However, her testimony about the ICT program in the middle school and how it would address GM's learning needs should be discounted as she is a special education teacher in the District elementary school and was unable to provide specific information about how the IEP would have been implemented in the middle school. T.190-197. Further, Ms. Diaco acknowledged that the only person on the CSE from the middle school was the guidance counselor, Vanessa Caine ("Ms. Caine"), who the District elected not to have testify. T.282. There was no testimony about Ms. Caine's specific participation in the April 2021 meeting except that she helped explain how ICT worked. T.296. However, there is nothing in the record to establish that Ms. Caine, as a middle school guidance counselor had experience working within an ICT class or was a classroom teacher at any time. As such, there is nothing in the record to establish that the CSE was able to have a full discussion about how the special education program would be implemented in the middle school.

The SRO gave undue weight to the testimony of District witnesses who did not have firsthand knowledge of the middle school ICT Program. Ms. Needleman was only able to testify about her general understanding of how an ICT program works based on her experience as an elementary school special education teacher. Ex.192-194. Ms. Needleman's testimony

justifying the ICT program included categorically broad statements about the benefits of the ICT program, noting that "there's such a benefit to being around non-disabled peers and having access to grade- level curriculum…for all students and for [GM] as well. GM has decoding skills that are intact and he has a lot of foundational skills. T.208. However, she was unable to elaborate as to how GM's significant deficits areas in reading comprehension and math would be remediated in the ICT program. Further, there was no evidence to establish that GM's intact decoding and foundational skills were enough for GM to make meaningful progress without specialized reading instruction and intensive remediation in math in a large, general education ICT program.

Despite evidence that GM required instruction presented at a slower pace along with a small group instructional model with opportunities for individualized support, the SRO improperly relied on the District's witnesses generic statements about the appropriateness of an ICT class. Ex. A1 at pp.31. The IHO, on the other hand, properly identified GM's needs for smaller classes due to his attentional challenges and acknowledged that it would be difficult for GM to learn in a class of 20 to 25 students as his attention issues would be exacerbated (IHO Dec. at p.29, T. 469). The SRO neglected to reconcile this concern about GM's attentional challenges.

As Ms. Needleman acknowledged, her educational testing scores were in line with Dr. Newman's findings regarding GM's math deficits. T.214. She acknowledged that GM performed between a kindergarten level and a mid-second grade level in math on both Dr. Newman's and her assessments. T.214. The program developed for 2021-2022 was for GM's sixth grade year. When questioned about whether GM was offered math remediation given his being significantly below grade level in math, she explained that GM was offered placement in

an ICT class where sixty percent of the students are general education students. T.214-215. It is clear that placement in a classroom of between twenty-three and thirty students (T.218), most of whom are general education students who are performing at or above grade level without any specific time allotted for math remediation was not reasonably calculated to enable GM to receive an educational benefit. Thus, the SRO erred in determining ICT services were appropriate for GM.

Furthermore, the SRO did not sufficiently consider the fact that the CSE failed to discuss the reasons for GM's progress at Windward during the April 2021 CSE meeting. The CSE failed to discuss the specifics of Windward's program to provide context to how GM was making progress. The CSE did not elicit information about the student to teacher ratio in any of GM's classes, how the content-area classes were instructed to meet GM at his learning levels, and what type of language-based instruction was being utilized in reading, writing and math to address GM's deficits. T.218.

And Dr. Newman's evaluations were not sufficiently considered during the CSE meeting. Ms. Needleman acknowledged that Dr. Newman's specific educational recommendations were not read and discussed at the CSE meeting, and she was unsure whether GM's learning disability diagnoses were discussed or whether the entirety of the CSE had access to Dr. Newman's report. T.218-221. Ms. Diaco confirmed that Dr. Newman's recommendations were not discussed.

Without a thorough review and discussion of Dr. Newman's report and educational placement recommendations the CSE could not develop a program that appropriately addressed GM's then- present levels of performance. Thus, the SRO improperly determined that the CSE made an appropriate recommendation based on the information it had available to it.

17

The CSE also recommended a 15:1 educational support class which was insufficient to address all of GM's learning deficits. Ms. Needleman was unable to confirm that GM would be placed with similarly functioning peers in that class. T.221 There was no testimony presented about how this educational support class would provide much-needed math remediation. Furthermore, there was no evidence in the record that the middle school would be able to provide specialized reading instruction within that educational support class – a special education support that GM requires in order to make progress. T.230-232. Thus, the SRO erred in determining that a 15:1 educational support class was appropriate for GM.

The SRO improperly determined that the IHO erred in finding that GM required specialized reading instruction because Dr. Newman did not make that specific recommendation in her report. Ex. A1 at pp. 31. The SRO's reasoning is flawed as he cites to GM's average scores in decoding and fluency, yet neglects GM's reading comprehension deficits and the need for specialized remediation to address those deficits. Ms. Diaco testified that the specialized reading program in the District "is based on various research-based reading programs that addresses decoding skills…that's the primary focus as students obtain those decoding skills. Sometimes they address reading comprehension as well after they have a solid foundation of decoding skills." T.320. However, the District chose not to recommend any specialized reading instruction for GM. The SRO improperly deferred to the school psychologist's opinion that GM did not require specialized

reading instruction because he was decoding in the average range rather than considering the full picture of GM's reading deficits. Ex. A1 at pp. 31.

Ms. Diaco's testimony did not provide a sufficient rationale for the decision not to offer specialized reading instruction, although she did acknowledge that based on Dr. Newman's

18

testing and GM's low comprehension scores, GM required remediation to address his comprehension weaknesses. T.328. When asked whether the middle school offered specialized reading classes, Ms. Diaco simply stated that if a student needs specialized reading, they would receive it and she did not know all of the classes that are available at the middle school, which is why the guidance counselor was present at the CSE meeting. T.322-323. Ms. Diaco also could not confirm whether specialized reading instruction was even considered during the April 2021 CSE meeting. T.323. Ultimately and despite his noted deficits, consistent through all testing, GM's IEP does not include any specific mandate for specialized reading instruction or remediation designed to address GM's reading deficits. Ex.21-1.

For these reasons, the CSE failed to offer GM an IEP that was reasonably calculated to enable GM to make meaningful progress and deprived him of a FAPE for the 2021-2022 school year.

POINT II: WINDWARD'S PROGRAM APPROPRIATELY MET GM'S SPECIAL EDUCATION NEEDS FOR THE 2020-2021 AND 2021-2022 SCHOOL YEARS.

The IHO properly determined that the Windward School was an appropriate placement for GM during both the 2020-2021 and 2021-2022 school years. Through documents and testimony, the parents presented sufficient evidence to meet their burden and establish that Windward provided educational instruction specially designed to meet GM's unique needs and permit him to benefit from instruction." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007); See, Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356, 364-65 (2d Cir. 2006).

Windward offered GM a full-time, multisensory instructional program designed for children with language-based learning challenges. All Windward instructors have at least a

Bachelor's degrees and most have a Master's degree. T. 545, 603. Though not a requirement under prong 2 of the Burlington-Carter analysis, many Windward teachers are licensed and certified in the State of New York, and most are Orton-Gillingham certified. T. 545, 705. Moreover, all Windward instructors are required to complete the Windward Teacher Training Institute ("WTTI") which includes three Capstone classes focusing on reading, writing and language and literacy. Tr. 552-553. Mandatory professional development training occurs on Fridays and teachers undergo retraining every five years. Tr. 553.

Windward's language-focused instruction is heavily based on the Orton-Gillingham methodology. Tr. 555. Orton-Gillingham focuses on building literacy skills by strengthening the connection of sounds and symbols, breaking down words in systematic and controlled ways so that students increase decoding and fluency skills and, in turn, improve comprehension skills across all content areas. Tr.556. This approach occurs in all content areas including math, social studies and science – all subject areas where reading is essential to learning the material. Tr.556.

Windward's math program is based on Singapore Math which de-emphasizes rote memorization and focuses on building students' understanding of math concepts using multisensory teaching strategies. Tr. 557. Windward also follows a GO Math or State Math curriculum which is modified based on the language needs of the class. Tr. 558. Just as is in Language Arts, students are grouped in math homogenously to facilitate appropriate pacing of instruction. T. 558. Such groupings also ensure that students are given proper remediation to address their deficits. T. 549.

Windward also maintains speech-language pathologists on staff, in addition to psychologists and guidance counselors. T. 550-551. The speech pathologists assist Windward teachers on an as-needed basis in addition to assessing students and advising parents if

additional speech-language support is required.

This program was in line with the recommendations of Dr. Dietrich and Dr. Newman. Though not as recently completed as Dr. Newman's evaluation, Dr. Dietrich's 2017 evaluation contained important information about GM's cognitive functioning and his specific disabilities. The evaluation was not used to contradict or dispute any of the findings of subsequent testing but to enhance an overall understanding of the student and the nature and extent of his learning limitations.

Dr. Newman's 2020 report similarly recommended "placement in a small, structured, supportive, full-time special education classroom within a small full-time special education school. She further recommended GM "to be provided with a multisensory instructional program that incorporates strategies and skill acquisition throughout the day… Structured Literacy instruction is systematic and cumulative, uses explicit instruction, and uses diagnostic teaching/individualized instruction". Ex. 15 at 33.

Dr. Newman also recommended G.M to continue outside speech therapy sessions with Gail Gallante, a private provider he had been working with since September 2015. Ex. 15 at 33; Tr. 697. During the school years in question, Ms. Gallante focused on pragmatic language skills, conversational discourse, organizing verbal narratives and using games to enhance GM's word retrieval. Tr. 702-703. Ms. Gallante and Dr. Newman testified clearly and convincingly that GM did not require the additional support of speech-language therapy sessions at school to make appropriate progress because the requisite support was already built-in to the curriculum. Tr. 465, 722. Notwithstanding the District's claims, Ms. Gallante testified that she lacked the expertise to provide math support to GM Tr. 709-710. Although she worked with GM to improve his verbal and visual memory, this is not dispositive of Windward's appropriateness

as such  work does not undermine the numerous other educational benefits GM received at Windward during the 2020-2021 and 2021-2022 school years.

During the 2020-2021 school year, GM was reading below grade level and Windward focused on the development of specific reading skills. Tr.586-587. He needed direct support in reading comprehension, specifically within the skills of inferential comprehension, making higher connections, making predictions, summarizing the main idea. Tr.587. Windward utilized its reading methodologies and specialized instruction to provide GM with direct supports in decoding and encoding. Tr.588. GM was reading aloud in class to his teacher to ensure that the teacher was able to systematically monitor his reading progress. Tr.589. Furthermore, the teacher conducted read-alouds to model appropriate fluency. Tr.589. In addition to Language Arts class, GM was in an Orton-Gillingham skills class where he worked on developing decoding and encoding skills, explicit vocabulary tasks and spelling rules. Tr.589. Ms. Damashek noted that he required the OG skills class because he still required direct support with both spelling and decoding of multisyllabic words and working on reading and writing strategies. T. 631. GM's progress report from June 2020 indicates the specific skills that he worked on during the school year and descriptions of the progress he made. Ex. E. GM improved with his fluency, his ability to read and connect the text, his decoding scores went up. Tr. 622.

In writing, GM received direct instruction in spelling, making sentences more complex, syntax and grammar (areas where he particularly struggled), summarizing and writing a complete sentence. Tr.594. And, in all subject areas, GM's executive functioning and attentional challenges required the small, supportive educational environment that Windward provided. Ms. Damashek noted that "two teachers has been essential for G. Very often the assistant teacher

will be working one to one…prompting and redirecting GM." Tr.595. Even in Windward's very small student-to-teacher ratio class, GM still required prompting and redirecting and one-to-one attention from a teacher. Tr.595. GM made progress in being able to write cohesive sentences over the course of the school year. Tr.622.

GM was in a small math class with two teachers where he followed a fifth-grade curriculum but it was very modified as GM really struggled in math and he was two or three years below grade level. Tr.597-598. He required 1:1 math tutoring during the 2020-2021 school year and there was demonstrated progress in GM's ability to do basic arithmetic. Tr.598. GM's math teachers during the 2020-2021 school year completed the Windward Teaching Training Institute which focused on utilizing language-based learning strategies within their classroom. T.599. GM was in a math class with nine other students and two teachers. T.601. GM benefitted from the small group, structured setting, the 1:1 tutoring and support, and the implementation of multisensory supports and direct instruction in problem solving and understanding math concepts. T.604. GM made progress in that he became more fluent with his basic arithmetic facts and he was able to set up and perform a simple word problem independently. T.623.

During the 2021-2022 school year, GM attended both reading and writing classes in a class of ten students with two teachers and copious 1:1 support. Tr. 595-596. He received a total of one hundred and twenty minutes per day of reading instruction and support. Tr. 591. His Language Arts instructors were Ms. Budnick and Ms. Bunyan. Ms. Budnick has a Master's degree in special education. Tr. 603. GM continued to improve his decoding skills and overall required less support than the previous school year. Tr. 585. However, Ms. Damashek explained that decoding remained "very taxing for him" and impacted his comprehension at times. Id. His basic comprehension skills were solid, but he struggled with higher level comprehension and

received 1:1 support to help develop these skills. Tr. 587; Ex. O-2. With Orton-Gillingham instruction, including multisensory tools, teacher scaffolding and direct support, he was able to comprehend texts at fifth grade level by the end of the year. Tr. 589. In writing, GM applied his improved sentence complexity to continue developing his paragraph writing. Tr. 594. Using the TEW writing curriculum, he began writing more cohesively and succinctly. Id.

Math continued to be an area of relative weakness for GM as he was two years below grade-level but his homework quality improved and he increased his participation and confidence with the material. Tr.623. He required additional practice in all of the skills his sixth-grade math class studied. Ex.O-4. He was in a small, homogeneously grouped math class of five students with two teachers and continued to receive 1:1 tutoring in math multiple times per week. T.605-607. The 1:1 support helped him with improving his automaticity of math facts, multiplication, division, computation. Tr.604. Both of GM's math teachers had their Master's in education and New York State teacher certifications. Tr. 598-599. GM also received direct teacher support for math problem solving and learned to underline key words to determine what a problem is asking for. T.604. For these reasons, Windward appropriately addressed GM's learning needs for the 2020- 2021 and 2021-2022 school years.

POINT III: EQUITABLE CONSIDERATIONS SUPPORT THE PARENTS' REQUEST FOR RELIEF

The final criteria for a reimbursement award is that the Parents' claim must be supported by equitable considerations.  The Supreme Court has stated that "[t]he core of the [IDEA] is the cooperative process that it establishes between parents and schools." Schaffer v. Weast, 546 U.S. 49, 53 (2005), citing Rowley, 458 U.S. at 205-06. Moreover, the Second Circuit has held that where parents cooperate with a district in its attempts to develop an appropriate educational program for their child, "their pursuit of a private placement is not a basis for denying their

[request for] tuition reimbursement, even assuming . . . that the parents never intended to keep [the student] in public school." C.L. v. Scarsdale Union Free Sch. D., 744 F.3d 826, 840 (2d Cir. 2014).

In the instant matter, the hearing record demonstrates that the Parents acted reasonably under the circumstances of this case and cooperated with the District in good faith to develop an appropriate IEP for GM for both school years at issue. The record reflects that the Parents did cooperate with the District's efforts to evaluate GM and they provided consent to speak with and obtain information from private providers to the CSE. Moreover, the Parents gave the District proper notice of their intent to unilaterally enroll the GM in writing. Therefore, as the IHO correctly determined, equitable considerations weigh in favor of the Parents overall and justify an award of tuition reimbursement for the 2020-2021 and 2021-2022 school years, under the circumstances of this case.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment in its entirety as follows: (I) Reversing the SRO's finding that the District provided GM with a FAPE for the 2020-2021 and 2021-2022 school years; (II) Sustaining the IHO's finding that Windward provided GM with an appropriate placement; (III) Sustaining the IHO's finding that equitable considerations did not preclude reimbursement; (IV) Awarding tuition reimbursement to Parents in the amount of $61,900 for the 2020-2021 school year and $64,400 for the 2021-2022 school year; and (V) For such other and further relief as the Court deems appropriate, and including attorney fees, costs, and disbursement of this proceeding.

Dated: July 29, 2023                      Respectfully Submitted,
New York, New York

                                             /s/
_____

Michael Mastrangelo (MM1433)
Law Offices of Neal H. Rosenberg
Attorneys for the Plaintiffs
111 John Street, 22nd Floor
New York, New York