UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
N.K.M. and M.M. on behalf of their minor child,
G.M.,

                             Plaintiffs,           **OPINION & ORDER**

    - against -                    No. 23-CV-1109 (CS)

RYE CITY SCHOOL DISTRICT,

                            Defendant.
------------------------------------------------------------x

Appearances:

Michael Mastrangelo
Law Office of Neal Rosenberg
New York, New York
*Counsel for Plaintiffs*

Thomas Scapoli
Ingerman Smith, LLP
Harrison, New York
*Counsel for Defendant*

Seibel, J.

       Before the Court is Plaintiffs' motion for summary judgment, (ECF No. 18), in this case

under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482.[1]

Plaintiffs appeal the decision of the State Review Officer ("SRO") which found that the Rye City

School District (the "District") had offered student G.M. a free and appropriate public education

("FAPE") during the 2020-2021 and 2021-2022 school years. (*See* ECF No. 1 ("Compl.") ¶¶ 1,

6.)

------

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education
Improvement Act, Pub. L. No. 108–446, 118 Stat. 2647, but cases discussing the IDEA remain
authoritative.

For the following reasons, Plaintiffs' motion is granted in part and denied in part.

## I.    BACKGROUND

The following facts are based on Plaintiffs' complaint and the administrative record.[2]

### A.  Facts

#### 1.    G.M.'s Early School Years

G.M. resides in Rye, New York with his parents, N.K.M. and M.M.  (Dist. Ex. 1 at 2.)
The Rye City School District is his home-zoned public school district in which he is eligible to
receive special education and related services.  (*Id.*)  In December 2014, at the age of four, G.M.
was referred to the Committee on Preschool Special Education because of concerns regarding his
language development.  (*Id.*; *see* Compl. ¶ 23; SRO Decision at 2; Dist. Ex. 4 at 1-2.)  After
various evaluations, G.M. began receiving speech and language therapy, and the District
provided an Individualized Education Program ("IEP") for the 2015-2016 school year.  (Dist. Ex.
4 at 2; Dist. Ex. 15 at 1.)

---

[2] The Office of State Review has provided the Court with the administrative decisions of
the Impartial Hearing Officer ("IHO") and the SRO, along with the certified record of the
impartial hearing, including hearing transcripts ("Tr."), exhibits, and post-hearing briefs.  The
pages of the hearing transcripts are numbered sequentially.  At the impartial hearing, exhibits
offered by the District were identified by number and exhibits offered by Plaintiffs were
identified by letter.  For purposes of this decision, I will refer to Plaintiffs' exhibits as "Ps' Ex."
and the District's exhibits as "Dist. Ex."

In an Order dated May 30, 2024, (*see* ECF No. 17), the Court granted the parties' joint
request to waive submission of the Local Rule 56.1 Statement of Material Facts and the
corresponding counterstatement.  Because a summary judgment motion in an IDEA case is "a
pragmatic procedural mechanism for reviewing administrative decisions," *A.C. ex rel. M.C. v.
Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) – rather than a
typical summary judgment motion – a Local Rule 56.1 statement is not required, *T.Y. v. N.Y. City
Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  (Unless otherwise indicated, case quotations
omit all internal citations, quotation marks, footnotes, and alterations.)  The parties agreed that
the case would be resolved by way of a motion by Plaintiffs.  (ECF No. 11.)

In September 2015, while enrolled in kindergarten at the Osborn Elementary School ("Osborn"),[3] G.M. was independently evaluated by Dr. Jeanne Dietrich, who determined that he had "at least average intelligence" and "presented with phonological deficits and the early indicators of a language-based learning disability (dyslexia)."  (Dist. Ex. 4 at 3; Compl. ¶ 24.) He struggled significantly during his 2016-2017 year at Osborn.  (Compl. ¶¶ 25-26; *see* Dist. Ex. 4 at 3.)

In March 2017, the private Windward School ("Windward") conducted an initial educational screening, (Ps' Ex. A), and in August 2017, Plaintiffs obtained an updated neuropsychological evaluation of G.M. from Dr. Dietrich, (Dist. Ex. 4).  For the 2017-2018 school year, Plaintiffs unilaterally placed G.M. at Windward, where he remained enrolled through the 2021-2022 school year. (*See* Dist. Ex. 5 at 1; Compl. ¶ 26; Ps' Exs. J, K.)  Windward is a grade 1-9 special education school for children with average to above-average cognitive potential, no significant behavioral needs and a language-based learning disability.  (Tr. at 544-45.)

### 2.    The 2020-2021 IEP

On June 10, 2020, the Committee on Special Education ("CSE") met to conduct G.M.'s annual review and develop an IEP for the 2020-2021 school year, his fifth grade year.  (Dist. Ex. 11 at 1.)[4]  The meeting participants were Amy Osooli, the District's supervisor of secondary special education; Erin Davies, a District special education teacher; Lara Damashek, the CSE

---

[3] In some instances in the record, the school is referred to as the "Osborne" Elementary School.  It appears that the proper spelling is "Osborn."  (*See, e.g.*, Dist. Ex. 9.)

[4] Citations to the June 2020 IEP refer to the page numbers created for the IHO record, not the internal pagination of the document.

liaison for Windward; Gail Gallante, a speech language therapist and G.M.'s private tutor; and

G.M.'s parents.  (*Id.*; Tr. at 41; Dist. Ex. 23 ("June 2020 Hearing Tr.") at 2.)[5]

As accurately summarized in the IEP, at the meeting G.M.'s parents reported that G.M.

had been at Windward for three years, is severely dyslexic, and was progressing and "slowly

acquiring" skills at Windward.  (Dist. Ex. 11 at 1; June 2020 Hearing Tr. at 4:15-5:7.)

Damashek reported that G.M. continued to have significant language needs, required assistance

with reading and writing, and was below grade level in math.  (Dist. Ex. 11 at 6-7; *see* June 2020

Hearing Tr. at 6:6-10:25; 12:8-14:7.)  Gallante reported that she had been working with G.M. for

about five years and that he has significant challenges with language processing and expressive

language, and also shared results from her speech and language evaluation dated January 28,

2020.  (Dist. Ex. 11 at 2; *see* June 2020 Hearing Tr. at 16:21-25:7.)  She testified that G.M.

scored within the average range on relational vocabulary, "did okay" with sentence completion,

"squeaked by" on paragraph construction, "did well" on text construction, scored well below

average on contextual fluency, and made phonological spelling and decoding errors.  (June 2020

Hearing Tr. at 18:11-23:6.)

The IEP lists the evaluations and reports that the CSE considered, including the parents'

and Damashek's reports at the meeting, various evaluations that the District conducted in March

and April 2018, a physical examination dated November 2017, and Dr. Dietrich's August 2017

evaluation.  (Dist. Ex. 11 at 3.)  The IEP also lists the scores from the District's March 2018

---

[5] Dist. Ex. 23 is labeled as the transcript of a June 10, 2021 CSE virtual meeting, but it should be dated June 10, 2020.  (*See* SRO Decision at 21 n.8; Tr. 860-61.)

The June 2020 IEP lists Courtney Albaum, a general education teacher, as a meeting participant, (Dist. Ex. 11 at 1), but Albaum is not listed in the appearances in the meeting transcript, nor mentioned by Osooli in the hearing transcript as being present at the meeting.

testing and Dr. Dietrich's August 2017 evaluation.  (*Id.* at 3-6.)  Ultimately, the CSE

recommended that G.M. receive 1.5 hours of integrated co-teaching ("ICT") services[6] for

language arts and 1 hour of ICT for math daily, specialized reading instructions (one hour daily

in a small group of five), speech/language therapy (three times in a six-day cycle for thirty

minutes individually), and social skills services (once in a six-day cycle for fifteen minutes

individually, and once in a six-day cycle for thirty minutes in a small group of five).  (*Id.* at 11.)

He was also recommended for various supplementary aids and services, program modifications,

and accommodations as appropriate, including extended school year services consisting of

specialized reading instruction in July and August.  (*See id.* at 11-14.)

The CSE originally had previously recommended that G.M. attend the ICT program at

Osborn, but determined that it would be most appropriate for G.M. to attend his home school, the

Milton School, which would be offering an ICT program for the 2020-2021 school year.  (*Id.* at

2.)  G.M.'s parents agreed with the school change but stated that they needed to review the IEP

and would let the District know if they would access the ICT program.  (*See id.*)  On August 31,

2020, G.M.'s parents informed the District that they would be unilaterally placing G.M. at

Windward for the 2020-2021 school year, and seeking tuition reimbursement and the provision

of transportation to and from Windward, because they did not believe that the District's program

was sufficient to meet his needs.  (Ps' Ex. J.)  Specifically, the parents stated that G.M.'s doctors

and clinicians had recommended "a full-time special education school with small classroom

sizes, with daily individualized support, modified instruction and curriculum and where the

---

[6] An ICT classroom allows for "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." 8 N.Y.C.R.R. § 200.6(g).  These classes contain, at a maximum, no more than 12 students with disabilities, and, at a minimum, a special education teacher and a general education teacher.  *Id.* §§ 200.6(g)(1), (g)(2).

classes are taught by teachers trained in teaching learning disabled students," and that Windward provides the necessary supports and modifications in a "small, structured nurturing school environment," while the modifications discussed at the CSE meeting would fail to provide G.M. with the appropriate support.  (*Id.*)

### 3.    The 2021-2022 IEP

G.M. was to be reevaluated every three years and his last evaluations were in 2018, so in March 2021, the District obtained a speech-language evaluation, an education evaluation, a psychological evaluation and a social history update.  (Dist. Ex. 21 at 4-5; *see* Dist. Ex. 11 at 2; Dist. Exs. 17-20.)[7]  On April 15, 2021, the CSE met again to develop G.M.'s IEP for the 2021-2022 school year.  (Dist. Ex. 21; Tr. at 282.)  The meeting participants were District psychologist Joanna Diaco, special education teacher Lisa Needleman, general education teacher Thomas Bailey, school guidance counselor Vanessa Caine, and speech/language therapist Devon Natale; Allison Campbell, a liaison from Windward; Gallante; and G.M's parents.  (*See* Dist. Ex. 21; Tr. at 282-83.)

The IEP indicates that at the meeting, Diaco reviewed the results of the psychological evaluation, which showed (among other things) general cognitive ability in the very low range of functioning but with a large scatter of skills, and Needleman reviewed the results of the education evaluation, reporting that G.M. had average decoding skills, below average reading comprehension and fluency skills, average overall written expression scores and math scores in the low range.  (Dist. Ex. 21 at 1-2; *see* Tr. at 284.)  A Wechsler Individual Achievement Test administered by Needleman on March 25, 2021 evaluated five math standards and placed him in

---

[7] Citations to the August 2021 IEP refer to the page numbers created for the IHO record, not the internal pagination of the document.

the 12th percentile for one, the 1st percentile for three, and the 0.1st percentile for one, resulting in a composite math score of the 4th percentile.  (Dist. Ex. 18 at 2; Dist. Ex. 21 at 6.)  A Woodcock-Johnson Test of Achievement administered by Dr. Dianne Newman on December 18, 2020 put G.M. in the 0.1st, 0.1st and 0.2nd percentiles (meaning lower than 99.9% or 99.8% of test-takers) in the three math standards.  (Dist. Ex. 15 at 14; Dist. Ex. 21 at 8.)

Gallante reported, among other things, that G.M. continues to struggle with language and math weaknesses but is making progress with conversational skills.  (Dist. Ex. 21 at 2.)  Natale reported on recent test results, noting similarities to Gallante's and the parents' assessments, and Campbell reported, among other things, that G.M. continued to work on reading with expression, had weaknesses in math, and experienced anxiety and difficulty focusing.  (*See id.*; Tr. at 377, 379.)  G.M.'s parents reported that there had been a lot of progress, that G.M. continued to have language needs, and that the small class size and opportunities to review material at Windward had been helpful.  (*See* Dist. Ex. 21 at 2-3.)  Under evaluations and reports, the IEP lists the parents' report, Gallante's progress summary and the Windward liaison's summaries provided at the meeting, the District's March 2021 evaluations, a November 20, 2020 physical exam, and Dr. Newman's December 18, 2020 psychological exam that set forth the following diagnoses:  a language disorder; learning disorders in mathematics, reading and written expression; and disruptive mood dysregulation disorder.  (*Id.* at 4-5; Dist. Ex. 15.)

The CSE recommended one 40-minute session per day of ICT services in language arts, math, social studies, and science, and 40 minutes daily in an educational support class.  (Dist. Ex. 21 at 14.)  The CSE also recommended two 30-minute sessions of individual speech/language therapy weekly, one 30-minute small group (5:1) session of speech/language therapy weekly, one 30-minute session of individual counseling weekly and one 30-minute session of small

group counseling weekly. (*Id.*) The IEP again recommended various supplementary aids and services, program modifications, and accommodations as appropriate daily or monthly. (*See id.* at 14-17.) The CSE discussed the ICT program, and the parents reported that they felt the Windward program worked for G.M. (*See id.* at 3.) On August 13, 2021, G.M.'s parents informed the District that they would be unilaterally placing G.M. at Windward for the 2021-2022 school year because they did not believe the District's recommended program was sufficient to meet G.M.'s needs, and that they would be seeking tuition reimbursement and the provision of transportation, (Ps' Ex. K).

### B. Procedural History

### 1. Requests for Due Process

On August 20, 2021, Plaintiffs filed a Due Process Complaint seeking a hearing before an IHO, findings that the District denied G.M. a FAPE for the 2020-2021 and 2021-2022 school years, and reimbursement for his tuition at Windward for those years. (Dist. Ex. 1.) Plaintiffs alleged, in sum, that the CSE meetings and IEP recommendations were substantively and procedurally inappropriate and failed to adequately address G.M.'s academic, social and emotional needs, in that the IEP failed to address G.M.'s need for small instructional classes, individualized attention, specialized teaching strategies, and multisensory techniques; the proposed class sizes were too large and the pull-out services would be distracting; the program modifications G.M. required could not be implemented in the District's proposed program; the CSE failed to adequately discuss and address the student's identified special education needs and behaviors that interfered with his learning; and the IEP was developed without meaningful parental participation because the program recommendations were determined before the meeting. (*See id.* at 4-11.) Plaintiffs alleged that the District was required to reimburse them for

the 2020-2021 and 2021-2022 school years because the programs offered by the District were inappropriate, their unilateral placement of G.M. at Windward was appropriate, and equitable considerations supported their claims. (*Id.* at 13.)

## 2. Impartial Hearing Officer Decision

An impartial hearing was held over six dates between December 6, 2021, and February 28, 2022. (IHO Decision at 5.) The IHO issued a final decision on July 1, 2022. (*See generally id.*)

### a. The Parents' Case

The parents called four witnesses: Dr. Newman, Damashek, Gallante, and N.K.M.

Dr. Newman testified about her December 2020 psychological evaluation of G.M. and described the various tests and results. (*See generally* Tr. at 430-458.) She concluded that because of G.M.'s impairments, he requires "continued placement in a small, structured, supportive full-time special education classroom," (Dist. Ex. 15 at 33; *see id.* at 462:2-463:10; IHO Decision at 9), and "a multi-sensory instructional program that incorporates strategies and skill acquisition throughout the day," (Dist. Ex. 15 at 33; *see* Tr. at 463:15-464:14; IHO Decision at 9.) Damashek testified that Windward is a full-time special education program with small class student-to-teacher ratios of 10:2 or 6:1, and that everything is tailored to the language-based difficulties of the students. (IHO Decision at 10-11; *see* Tr. at 545:14-.546:10.) Gallante testified that she believed G.M. required a language-based curriculum throughout the school day for the 2021-2022 school year and specifically the Orton-Gillingham curriculum,[8] and that she

---

[8] "Orton-Gillingham is a specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 384 n.12 (S.D.N.Y. 2006). Gallante testified that it "is very systematic" and repetitive and "makes sure that the child doesn't have holes in their [language] acquisition." (Tr. at 710:25-712:18.)

believed Windward's program was adequate.  (IHO Decision at 14-16; *see* Tr. at 707:25-709:7; 712:19-714:13; 719:14-721:4.)  Lastly, N.K.M. testified that at the 2020 CSE meeting, G.M. was recommended for ICT classes but there was no explicit discussion of what the class entailed or how it would meet G.M.'s needs.  (IHO Decision at 17; *see* Tr. at 822:6-24.)  She also testified that for both IEP meetings, there was no discussion of a full-time special education program for G.M., (Tr. at 834:23-835:6), and that at the 2021 CSE meeting, a full-time special education class was discussed but it was determined that it would have been too restrictive for G.M.  (IHO Decision at 18; Tr. at 835:7-22; 885:4-16.)[9]

    b.  The District's Case

  The District called four witnesses:  Osooli, Needleman, Diaco and Natale.  Osooli, who chaired the June 2020 CSE meeting, testified that at that meeting, they considered feedback from the parents, Windward staff and Gallante, and that any goals they recommended were considered and added to the IEP.  (IHO Decision at 19-20.)  She also testified that the District's reading program does not involve a specific type of instruction like Orton-Gillingham, but is multisensory and uses different approaches; that the ICT program can meet the needs of all learners because, in an ICT classroom, the special education teacher co-plans and co-facilitates lessons and instruction and, in the middle school ICT program, there is a special education teacher on the team for all content areas who follows the students from class to class; and that she did not believe that G.M. needed to be educated in a school solely with other students with disabilities.  (*Id.* at 21.)  Osooli also testified that the most updated standardized testing considered at the 2020 CSE meeting was from spring 2018 and that they did not discuss Dr.

---

    [9] The IHO Decision states that N.K.M. testified that a full-time special education class was "recommended," (IHO Decision at 18), but it is clear from the transcript that she testified that it was considered but not recommended, (Tr. at 835:7-22, 885:4-16).

Dietrich's 2017 report at the meeting because it was previously discussed and the parents did not

ask for a re-review of the report.  (*Id.* at 22; Tr. at 87-90.)

Needleman, who attended the April 2021 CSE meeting, testified about her

responsibilities as a District special education teacher in an ICT classroom, and about the results

of her educational evaluation of G.M. on March 25, 2021.  (IHO Decision at 23; Dist. Ex. 18.)

With respect to the CSE's determinations, Needleman testified that there was no disagreement on

the goals and that because G.M. was going to the sixth grade, the CSE decided that G.M. should

be in ICT classes for his core subjects and also have an educational support class, which

Needleman believed would provide plenty of individual instruction.  (IHO Decision at 24-25.)

She also testified that each goal was based on her educational evaluation, Dr. Newman's 2020

psychological evaluation, and input from G.M.'s private tutor, G.M.'s parents, and Windward.

(*Id.* at 26.)  She noted that her evaluation of G.M.'s skills was similar to Dr. Newman's, (Tr. at

182, 214), and that G.M.'s math skills aligned with a kindergarten or first grade level, (*id.* at

224).

Diaco, the school psychologist who chaired the 2021 CSE meeting, testified that at the

meeting, she reviewed her March 25, 2021 psychological evaluation of G.M., Needleman

reviewed her educational evaluation, and Natale reviewed her speech-language evaluation.  (IHO

Decision at 28.)  Windward, Gallante, and the parents then provided an update and the group

agreed that G.M. should be classified as having a learning disability.  (*Id.*)  With respect to

specialized reading, Diaco stated that she believed an ICT class would be the least restrictive

environment in which he could achieve his reading goals, and with respect to the educational

support class, G.M. would be with his special education teacher and 15 students, and there would

be opportunities for reteaching, planning for long-term assignments, teaching study skills and strategies, and ensuring academic IEP goals were met.  (*Id.* at 28-29.)

Natale testified regarding her speech-language evaluation of G.M. and stated that the goals she developed based on her evaluation and the input of the team were not disputed at the 2021 CSE meeting.  (*See id.* at 29-31.)  She also testified that, based on G.M.'s present levels of performance, the speech and language goals on the IEP were appropriate.  (*Id.* at 31.)

### c.    The IHO's Findings

The IHO determined that the District had not provided a FAPE for the 2020-2021 and 2021-2022 school years.  (*Id.* at 34.)

With respect to the 2020-2021 school year, the IHO noted that Osooli testified that neither the results of the March 29, 2018 educational evaluation nor the results of the August 1, 2017 private neuropsychological evaluation were discussed at the IEP meeting, and that although the qualitative testing from these evaluations were on the IEP, Osooli stated that the results were not considered in developing the IEP.  (*Id.*)[10]  The IHO listed the diagnoses in Dr. Dietrich's 2017 report and noted that although Dr. Dietrich had diagnosed G.M. as having a learning disability with impairment in mathematics, this was not mentioned in the IEP, and Osooli testified that she was not aware of the dyslexia diagnosis or the mathematics learning disability noted in the report.  (*Id.* at 34-35.)  The IHO further pointed out that G.M. was only offered ICT classes for language arts and math and not phonics or any other subjects, and that Osooli testified that she did not know whether Windward's input as to goals was based on the context of Windward's program, which the IHO stated makes a "tremendous difference" in the

_____

[10] The IHO incorrectly described the evaluation as dated August 1, 2018, (*see* IHO Decision at 34), but intended to refer to Dr. Dietrich's August 1, 2017 evaluation, (Dist. Ex. 4).

development and appropriateness of the program.  (*Id.* at 35.)  The IHO also stated that Dr.

Dietrich recommended that G.M. receive "a program such as Orton-Gillingham . . . throughout

the school day," but the reading instruction on the IEP was not the Orton-Gillingham approach

and was not provided throughout the day but rather was a "combination of reading instructional

approaches."  (*Id.*)  The IHO determined that with G.M.'s reading and writing deficiencies, the

District's recommendations for ICT class would not enable G.M. to progress.  (*Id.*)

The IHO further noted that Damashek and Gallante both believed that G.M. required a

small class size and the Orton-Gillingham approach, and that Gallante also believed that G.M.

required assistance with deficits in math.  (*Id.* at 36.)  Finally, the IHO noted that the parents

testified that when the ICT class was recommended for language arts and math, there was no

"explicit discussion" of what the class entailed or how G.M.'s needs would be met in the class,

and that Osooli only testified generally about the ICT program, stating that it "can meet the

needs of all learners," rather than addressing how the program would meet G.M.'s specific

needs.  (*Id.*)  The IHO determined that based on the above, the District did not meet its burden of

showing that the 2020-2021 IEP recommendations were sufficient.  (*Id.*)

With respect to the 2021-2022 school year, the IHO stated that Needleman testified at the

2021 CSE meeting that she had a copy of Dr. Newman's December 2020 report, but the IHO

noted that Dr. Newman's recommendations were not discussed at the meeting because,

according to Needleman, it had already been determined that ICT would be the program for the

2021-2022 school year.  (*Id.* at 37.)[11]  The IHO listed the evaluations that were included in the

_____

[11] While the IHO states that Needleman testified that it had already been determined that
ICT would be the program for the 2021-2022 year, the IHO does not cite testimony to that effect,
and the Court finds no such testimony.  Needleman testified that the first recommendation in the
Newman report – in sum, that G.M. be placed in a small, structured full-time special education

IEP, and stated that Dr. Newman's report was not appropriately reviewed at the meeting.  (*Id.*)

The IHO stated that based on Needleman's and Newman's testing results, learning new

information for G.M. is difficult and requires information to be broken down and repeated many

times, and also noted that after the goals were discussed, the Windward representative stated that

she had concerns about whether G.M. could meet those goals in an ICT class.  (*Id.* at 38.)  The

IHO described Dr. Newman's recommendations, including that G.M. "continue in a

multisensory instructional program in a small structured full time special education classroom

within a full time special education school where language is intertwined in every aspect of

learning;" that he needed support to apply basic skills in reading comprehension, writing and

math; and that the school had to continue with and increase decoding interventions.  (*Id.* at 38-

39.)  The IHO stated that she "[found] Dr. Newman's testimony credible in this regard," and

highlighted that Dr. Newman stated that G.M. would not be a candidate for ICT classes because

of his specific needs, that it would be difficult for him to learn in a 20-25 student class due to

attention issues, and that he required an integrated specialized reading program that the District

does not have.  (*Id.* at 39.)

     The IHO further noted that Diaco had concluded that because G.M. was scoring in the

average range for decoding, he would not need a systematic program to learn phonics, and thus

the CSE removed a 5:1 specialized reading class from G.M.'s schedule and replaced it with a

15-student educational support class, although Diaco did not explain her reasoning.  (*Id.*)  The

IHO determined that even though the special education teacher in the educational support class

_____

classroom in a small, full-time special education school – "wasn't read from the report and
discussed" but "was discussed to see what the most appropriate program for [G.M.] would be."
(Tr. at 218:16-219:4.)  She also testified that the CSE's recommendation was "counter" to Dr.
Newman's recommendation because the CSE "believe[d] that [G.M.] would make meaningful
progress in the integrated co-teach setting."  (*Id.* at 219:5-14.)

would provide opportunities for reteaching, planning for long-term assignments, and teaching study skills and strategies, there was no indication that reading would be taught in any manner, and "[b]ased on [G.M.'s] testing, he clearly needs a specialized reading program and would be lost without it." (*Id.*)

The IHO next determined that the parents had met their burden of showing that their unilateral placement of G.M. at Windward was appropriate because Windward provided G.M. with educational instruction that was specifically tailored to his needs and he was receiving an educational benefit. (*Id.* at 40.) Based on the parents' and Damashek's testimony, the IHO found that Windward offers a multisensory educational program for children with language-based disabilities and that it is a full-time special education program that meets students' needs through small classes with a high teacher-student ratio. (*Id.*) The IHO also noted that Windward offers special programs, including the Orton-Gillingham program, and reiterated the findings in Dr. Dietrich's 2017 psychological evaluation and Dr. Newman's 2020 neuropsychological evaluation and testimony at the hearing that although G.M. scores were average in some areas of reading, he had significant comprehension deficits and continued to require a specialized multisensory remedial reading program throughout the day and the support of Windward to apply the skills he had learned to reading, writing, and math. (*Id.* at 41.) The IHO highlighted that G.M. made progress during the 2020-2021 school years, and that the parents and Damashek testified that G.M. was responding well to the curriculum. (*Id.* at 41-42.) The IHO further considered Gallante's testimony that Windward was providing adequate support to address G.M.'s needs and that there was no need to add to the program. (*Id.* at 42.) Based on this information, the IHO concluded that Windward was an appropriate placement. (*Id.*)

Lastly, the IHO concluded that equitable considerations were in Plaintiffs' favor. (*Id.* at 43.) The IHO explained that the parents participated in the CSE meetings, provided the school with all reports and necessary evaluations, and cooperated with the District. (*Id.*) Additionally, the IHO concluded that although the District asserted that the parents generally agreed with the IEPs at the meetings, this was not the case because the parents raised several objections to the recommendations and, at both meetings, said that they needed to review the IEP report before determining whether they would access the District's programs. (*Id.*) The IHO further noted that upon reviewing a draft of Dr. Newman's 2020 evaluation, the parents asked her to change her recommendation from being specific to Windward to recommending a program with sufficient supports, and that N.K.M. had testified that the parents would have given up their deposit at Windward had the District offered an appropriate program. (*Id.*) The IHO concluded that these facts showed that the parents were open to considering other District programs that would have met Dr. Newman's recommendation. (*Id.*)

Based on her conclusion that the District failed to provide a FAPE, that Windward was an appropriate placement and that equitable considerations offered no basis to deny the parents' application, the IHO ordered the District to reimburse the parents for both the 2020-2021 and 2021-2022 school years. (*Id.* at 43-44.)

### 3.    State Review Officer Decision

The District appealed the IHO's decision to the Office of State Review on July 20, 2022. (*See* Notice of Intention to Seek Review). The SRO issued a final decision on November 10, 2022, reversing the IHO's determination that the District failed to provide a FAPE for the 2020-2021 and 2021-2022 school years. (SRO Decision at 32-33.)

a.    2020-2021 School Year

The SRO first discussed the evaluative information that the District considered to create

the 2020-2021 IEP.  In its request for review before the SRO, the District argued that the IHO

erred in relying on Dr. Dietrich's August 2017 neuropsychological report to determine that the

June 2020 CSE's recommendations were inappropriate, and improperly determined that the CSE

did not consider the report.  (*See* Verified Request for Review at 1-2.)  In their opposition, the

parents argued that the IHO was obligated to consider the 2017 report because it contained the

most recent standardized testing prior to the 2020-2021 school year and was one component for

understanding G.M.'s needs.  (SRO Decision at 13; Parents' Memorandum of Law to SRO at 5-

7.)  Furthermore, the parents argued that the IHO was less concerned that the 2017 report was

not considered and more concerned with the CSE's recommendations in light of the report.

(SRO Decision at 13; *see* Parents' Memorandum of Law to SRO at 6.)

The SRO laid out the standard that "[i]n developing the recommendations for a student's

IEP, the CSE must consider the results of the initial or most recent evaluation; the student's

strengths; the concerns of the parents for enhancing the education of their child; [and] the

academic, developmental, and functional needs of the student . . . ."  (SRO Decision at 13 (citing

34 C.F.R. 300.324(a); 8 NYCRR 200.4(d)(2))).  Furthermore, the CSE "must consider

independent educational evaluations," (*id.* (citing 34 C.F.R. 300.502(c); 8 NYCRR

200.5(g)(1)(vi))), although "consideration does not require substantive discussion, or that every

member of the CSE read the document, or that the CSE accord the private evaluation any

particular weight or adopt their recommendations," (*id.* (collecting cases)).

The SRO concluded that based on the evidence in the record, the CSE properly reviewed

and considered the available evaluative information.  First, Osooli, the District supervisor of

secondary special education and the chairperson of the June 2020 CSE meeting, testified that she

prepared the IEP in collaboration with the Windward liaison, the private speech-language

pathologist, the parents, and the District special education teacher but that the CSE heavily relied

on feedback from the Windward staff, the parents, and the private speech-language pathologist

because they were working most directly with G.M.  (*Id.* at 14.)  Moreover, Osooli testified that

the 2017 report was not discussed at the June 2020 CSE meeting because it had been previously

discussed, but – contrary to that testimony – the report was listed in the June 2020 IEP under

evaluations/reports, the IEP included the results from the report, and the report was referenced in

the "Academic Achievement, Functional Performance and Learning Characteristics" section.

(*Id.*)  As for the parents' argument that the IEP failed to include specific language from the

report, the SRO reasoned that while the June 2020 IEP did not specifically include the diagnoses

identified in the 2017 report, the CSE identified G.M.'s needs and developed the present levels

of performance in accordance with those diagnoses.  (*Id.* at 15-16.)  Additionally, the IEP

identified suitable strategies to meet G.M.'s needs.  (*Id.* at 16.)  The SRO concluded that the CSE

identified G.M.'s needs consistent with the needs described in the 2017 report; that the lack of

specific diagnoses in the IEP did not rise to the level of a denial of a FAPE; and that the CSE

was not required to "adopt wholesale" the recommendations in the 2017 report.  (*Id.*)[12]

The SRO then considered the District's argument that the IHO erred in finding that the

goals were improper and the parents' counterargument that the IHO did not explicitly find the

goals inappropriate but rather questioned whether they could be appropriately addressed in the

---

[12] The SRO also described the other evaluations and reports that were available to the
CSE, including the spring 2018 evaluations, and reports from the parents, Gallante, and the
Windward teachers and staff, noting that although consideration of these sources was not at
issue, their results framed the CSE's review of G.M.'s needs.  (*See id.* at 16.)  The Court
considers these additional evaluative reports in its analysis but does not summarize them.

CSE's recommended program. (*Id.* at 18.) The SRO laid out the standard that "[a]n IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum, and meet each of the student's other educational needs that result from the student's disability." (*Id.* at 19 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. 300.320(a)(2)(i); 8 NYCRR 200.4(d)(2)(iii)).) The annual goal must also include evaluative criteria, evaluation procedures and schedules to measure progress. (*Id.* (citing 8 NYCRR 200.4(d)(2)(iii)(b); 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. 300.320(a)(3)).) The SRO reasoned that the June 2020 IEP included annual reading, writing, math, speech-language and social/emotional/behavioral goals that addressed G.M.'s identified needs, and included the required evaluative criteria, evaluation procedures and progress schedules. (*Id.*) The SRO further clarified that to the extent the parents argued that the annual goals discussed were within the context of the Windward program, the appropriateness of annual goals does not turn on the suitability of the goals within a certain classroom setting or student-to-teacher ratio, but rather on whether the goals are consistent with the student's needs. (*Id.* at 19-20.) The SRO concluded that the June 2020 IEP goals addressed G.M.'s main needs, and any minor deficiencies did not detract from the overall appropriateness of the goals. (*Id.* at 20.)

Next the SRO addressed the District's argument that the IHO erred in determining that the CSE failed to explicitly discuss what an ICT class entailed and how G.M.'s needs would be met in such a class, (*id.*), determining that the June 2020 CSE meeting transcript includes discussion about the delivery of the program, (*id.* at 21 (citing June 2020 Hearing Tr. at 1-33)), and noting that the parents had not taken opportunities to ask for additional information about the

ICT classroom, (*id.* at 22 (citing June 2020 Hearing Tr. at 1-21)). The SRO thus concluded that the record does not support the claim that the District failed to offer a FAPE because the CSE did not explicitly discuss how G.M.'s needs would be met. (*Id.* at 22.)

Lastly, the SRO considered the District's arguments that the IHO ignored the CSE's recommendations for specialized reading and speech-language therapy and that the CSE appropriately recommended specialized reading instruction without citing a specific reading program, and the parents' argument that the IHO correctly determined that G.M. required a specific language-based, structured, evidence-based reading curriculum that the ICT class would not have provided. (*Id.*) The SRO noted state guidance that the term "specialized reading instruction" does not necessarily need to appear in the IEP and that specialized reading instruction may be provided through various means. (*Id.* (citing "Guidelines on Implementation of Specially Designed Reading Instruction to Students with Disabilities and Clarification About 'Lack of Instruction' in Determining Eligibility for Special Education," VESID Mem. (May 1999)).) Additionally, the SRO noted that "a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter left to the teacher's discretion – absent evidence that a specific methodology is necessary." (*Id.* at 23 (collecting cases).) The SRO reasoned that while the IHO pointed to the 2017 report's recommendation that G.M. receive an evidence-based curriculum, such as Orton-Gillingham, throughout the day, the Windward progress report from February 2020 did not indicate that he required a specific teaching methodology throughout the day to make progress in reading. (*Id.*) Furthermore, in addition to the ICT classes for language arts and math, the IEP provided sessions for group specialized reading instruction, individual speech-language therapy, and individual social skills instruction, consistent with Osooli's statement at the CSE meeting that specialized

reading instruction in a small group should be continued based on G.M.'s reading, decoding and

fluency skills. (*Id.* at 24.) At the impartial hearing, Osooli testified that the District's reading

instruction used a multisensory approach in which the providers were trained, and that the ICT

teachers followed the Teachers College Reading and Writing Workshop, which allowed for

targeted learning in small groups. (*Id.*) The District special education teacher also testified that

G.M. was recommended to have 60 minutes of specialized reading instruction daily, during

which he would work on decoding, encoding and fluency needs, and that the school had a

separate program for phonics. (*Id.*) Additionally, to prevent substantial regression in reading,

the CSE recommended 12 months of three 60-minute sessions per week of specialized reading,

and the IEP included various accommodations and supports. (*Id.* at 25.) For all these reasons,

the SRO determined that

> [w]hile the parents are correct that the June 2020 IEP did not include the recommendation
> of a specific reading program as recommended in the August 2017 neuropsychological
> re-evaluation report or the specific program used by Windward staff, the evidence in the
> record shows that the totality of the program offered through the June 2020 IEP
> appropriately addressed the student's learning needs, specifically his needs in receptive
> language, decoding, and comprehension and the recommendation of a specific
> methodology for reading instruction was not required to provide the student with a FAPE.

*Id.*

### b.    2021-2022 School Year

With respect to the 2021-2022 school year, (*see id.* at 26-32), the SRO first considered

the District's argument that the IHO erred in determining that the CSE did not appropriately

review Dr. Newman's December 2020 psychological evaluation report, given that the report is

listed in the evaluation section of the April 2021 IEP, the diagnosis and test results are discussed

in detail in the comment section, and Diaco testified that when she reviewed her evaluation, she

compared her results to those in Dr. Newman's report. (*Id.* at 26.) The SRO noted that

consideration of an independent education evaluation does not require that every CSE member

read the report or that the report be afforded particular weight, and concluded that the hearing record did not support the IHO's finding that the April 2021 CSE failed to appropriately review the 2020 report.  (*Id.* at 26-27.)[13]

The SRO next concluded that the hearing record supported the District's argument that the IHO erred in finding that the annual goals were improper.  (*Id.* at 28.)  First, according to the meeting information summary, the April 2021 CSE reviewed all of the annual goals from the 2020-2021 IEP and developed the April 2021 goals based on G.M.'s progress.  (*Id.*) Additionally, the annual goals addressed G.M.'s needs in reading, writing, math, speaking and listening, and speech-language, and also included social/emotional/behavioral goals, as well as evaluative criteria, evaluation procedures, and schedules to measure progress.  (*Id.* at 28-29.) Furthermore, the meeting information summary reflected that Ms. Damashek, the Windward liaison, opined that the goals were appropriate, and Diaco, the school psychologist, testified that the goals were appropriate because they were based on standardized testing and input from the parent, the Windward liaison and G.M.'s private speech-language pathologist.  (*Id.* at 29.) Therefore, the SRO concluded that the evidence did not show that the annual goals in the April 2021 IEP were improper or constituted a denial of a FAPE.  (*Id.*)

Turning to the ICT services, the parents argued that the IHO properly determined that the District did not adequately show that the recommended ICT classes and educational support class combined with general education classes and related services were sufficient to meet G.M.'s needs.  (*Id.*)  The SRO noted that the April 2021 IEP changed the previous IEP in that it now recommended ICT services in ELA, math, science, and social studies (in other words, all

---

[13] The SRO described the results of the additional evaluative information that the April 2021 CSE considered.  (*See id.* at 27-28.)  I consider these additional reports, but do not summarize them.

content areas, not just ELA and math) and that reading skills would be addressed in the ICT class (as opposed to specialized reading instruction). (*Id.* at 30.) Diaco testified that the daily educational support class would be taught by the same special education teacher who would travel with G.M. to his ICT classes, and that the support class would allow for reteaching, planning for long-term assignments, teaching study skills and strategies, and ensuring goals were met. (*Id.*) Additionally, the meeting information summary stated that the parents reported that the program at Windward was working for G.M., and that although a full-time special education class was considered, it was determined to be too restrictive for G.M. at that time. (*Id.*)

The SRO noted that the IHO pointed to Dr. Newman's testimony that it would be difficult for G.M. to learn in a class of 20 to 25 students, and presumed that this caused Dr. Newman to recommend that G.M. be in a "small, structured, supportive full-time special education classroom placement within a small, full-time special education school" with additional supports. (*Id.*) The SRO summarized Diaco's contrary testimony that the ICT program would allow G.M. to be exposed to both non-disabled students and students with disabilities and to the general education curriculum, and that the ICT model and educational support class provided opportunities for instruction in small group and individual settings. (*Id.* at 31.) Lastly, the SRO noted that the IEP included various supports. (*Id.*) Based on this evidence, the SRO concluded that that ICT classes with an education support class were sufficient to meet G.M.'s needs. (*Id.*) The SRO did not address the parents' argument that the District had not acknowledged the fact that both Newman and Needleman assessed G.M. as performing between a kindergarten and mid-second-grade level in math, and that it had not explained how the necessary significant remediation could be accomplished in an ICT class in which sixty percent

of the approximately 25 students were general education students mostly performing at or above grade level.  (Parents' Memorandum of Law to SRO at 13-14.)

Finally, the SRO considered the District's argument that the IHO erred in finding, based on Dr. Newman's recommendation, that G.M. required a specialized reading program integrated throughout the day for the 2021-2022 school year.  (SRO Decision at 31.)  Dr. Newman's testing results determined that G.M.'s decoding skills and sentence reading fluency were both average, but the IHO found that he clearly needed a specialized reading program.  (*Id.* at 31-32.)  The IHO credited Dr. Newman's testimony that the school needed to continue decoding interventions and take them to the next level, but also noted that the school psychologist disagreed with that assessment because G.M.'s decoding scores were average and G.M. did not need a systematic program to learn phonics.  (*Id.*)  The SRO noted that Dr. Newman did not include a recommendation for an integrated specialized reading program in her report, which stated that G.M. was performing in the average range in reading achievement and basic reading skills and found that basic reading, reading fluency, and sentence reading fluency were "area[s] of personal strength" for him.  (*Id.* at 32; *see* Dist. Ex. 15 at 16-17, 29, 31.)  Thus, the SRO concluded that the IHO erred in weighing Dr. Newman's opinion so heavily when it was only articulated after the CSE meeting.  (SRO Decision at 32.)  Lastly, the SRO noted that reports from Windward indicated that G.M.'s decoding and reading skills had been improving, and that the IEP recommended group and individual speech-language therapy and additional supports and accommodations.  (*Id.*)  Based on these findings, the SRO determined that the hearing record did not support the IHO's finding that G.M. required specialized reading instruction throughout the day to receive educational benefit.  (*Id.*)

Having determined that the evidence supported the conclusion that the District offered G.M. a FAPE for the 2020-2021 and 2021-2022 school years, the SRO did not reach the issues of whether Windward was an appropriate placement or whether equitable considerations weighted in Plaintiffs' favor.  (*Id.* at 32-33.)

### 4.    The Instant Action

Plaintiffs filed their Complaint on February 9, 2023.  (*See* ECF No. 1.)  It seeks a judgment that (1) reverses the SRO's finding that the District provided G.M. with a FAPE; (2) finds that the District failed to provide G.M. a FAPE for the 2020-2021 and 2021-2022 school years; and (3) awards reimbursement of tuition for those years.  (*Id.* at 19.)

## II.    <u>LEGAL STANDARDS</u>

### A.    <u>Summary Judgment Standard for IDEA</u>

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *See id.*  Rather, as noted, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016). The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129; *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of the City of N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision. *A.C.*, 553 F.3d at 171. Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational

policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

Accordingly, "a court must defer to the SRO's decision on matters requiring educational

expertise unless it concludes that the decision was inadequately reasoned," *R.E. v. N.Y. City

Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations

regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to

"the application of expertise and the exercise of judgment by school authorities" is appropriate

where they "offer a cogent and responsive explanation for their decisions." *Endrew F. ex rel.

Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017).

## B.  <u>Provision of a FAPE and Unilateral Placement in Private Schools</u>

"The IDEA requires States receiving federal funds to provide 'all children with

disabilities' with a FAPE," which includes "'special education and related services' tailored to

meet the unique needs of a particular child." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735,

741 (2d Cir. 2018) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)).  Related

services include "transportation, and such developmental, corrective, and other supportive

services . . . as may be required to assist a child with a disability to benefit from special

education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled

children.'" *Mr. P*, 885 F.3d at 741 (quoting *Endrew F.*, 580 U.S. at 391).  The IEP must be

developed annually by "[a] school official qualified in special education, the child's teacher, the

child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122.  "A school district

meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with

the IDEA's procedural and substantive requirements." *N.B. v. N.Y. City Dep't of Educ.*, 711 F.

App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of

an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'"  *Mr. P*, 885 F.3d at 748 (quoting *Endrew F.*, 580 U.S. at 403).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress."  *N.B.*, 711 F. App'x at 32.  The program "must be appropriately ambitious in light of [the child's] circumstance," *Endrew F.*, 580 U.S. at 402, but "[w]hat the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132.

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment," *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)), known as the "LRE."  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).  "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  *Id.* at 161; *see* 34 C.F.R. § 300.116(c) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled.").  To determine whether a student's placement is the LRE, courts consider (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and (2) "if not, then whether the school has mainstreamed the

child to the maximum extent appropriate." *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120 (2d Cir. 2008).

"New York's regulations implementing the goals of the IDEA 'appear to track the IDEA closely.'" *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b.  Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student."  N.Y. Educ. Law § 4404(1); *see* 20 U.S.C. § 1415(b)(6)(A) (to the same effect).  Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2).  Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a school district fails to offer a FAPE, parents may unilaterally enroll their child in private school and seek tuition reimbursement." *Jusino v. N.Y. City Dep't of Educ.*, 700 F. App'x 25, 27 (2d Cir. 2017) (summary order); *see Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) ("If a state receiving IDEA funding fails to give a disabled child a FAPE . . . the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state."). "Reimbursement is granted only when (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim." *Jusino*, 700 F. App'x at 27; *see R.C. v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 15-CV-5848, 2016 WL

5477747, at *10 (S.D.N.Y. Sept. 29, 2016) ("Parents who seek such reimbursement must satisfy the three-pronged *Burlington/Carter* test . . . ."). Under New York law, the school district "bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement." *T.K. v. N.Y. City Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016).

## III.    DISCUSSION

### A.    The 2020-2021 School Year

Plaintiffs argue that the SRO incorrectly found that the District provided G.M. a FAPE for the 2020-2021 school year for several reasons. (*See* ECF No. 19 ("Ps' Mem.") at 2-11.)

First, Plaintiffs argue that the "earliest report relevant to the school years at issue" was Dr. Dietrich's 2017 report, and that it was "completely neglected" by the CSE and not discussed at the June 2020 meeting even though it provided important information about G.M.'s learning deficits. (*Id.* at 3-4.) They further contend that while consideration of evaluations does not require substantive discussion or that the CSE afford the evaluation particular weight or adopt its recommendations, here the District failed to even rely on the evaluation to determine G.M.'s levels of functional performance. (*Id.* at 5-6.) The District responds that the SRO properly relied on Osooli's testimony that the District had previously reviewed the 2017 Dietrich report and had more recent evaluative information, including the District's 2018 evaluations and input from the parents, Damashek, and Gallante; that the SRO properly reviewed these reports and concluded that they were consistent with the IEP; and that any failure to include additional information from the 2017 report did not constitute a denial of a FAPE. (ECF No. 20 ("Dist. Opp.") at 9-10.)

"A CSE must consider the results of the initial or most recent evaluation." *M.E. v. N.Y. City Dep't of Educ.*, No. 22-CV-9642, 2024 WL 1514299, at *8 (S.D.N.Y. Apr. 8, 2024). "Consideration of an evaluation, however, does not mean that every member of the CSE has to read the document, or that the CSE needs to accord an evaluation by a privately retained expert any particular weight." *Id.* Under this standard, the CSE did what it was required to do. As the CSE had more recent evaluations, it was not required to consider the 2017 evaluation, and Plaintiffs have provided no authority suggesting that a CSE that has already reviewed and considered a report must do anything in particular to incorporate it into its decision-making in subsequent years. But even if such consideration were required, the June 2020 IEP, as the SRO noted, included the testing results from the 2017 report in several places, demonstrating that it was considered even if not explicitly discussed, and therefore the IEP adequately identified the student's needs, including those contained in the 2017 report. (SRO Decision at 14.) The SRO described that the cognitive testing conducted as part of the 2017 report found G.M. generally functioning in the average range, determined G.M.'s decoding skills were weak, and indicated that he received a high score in pseudoword decoding and below average and average total reading and basic reading scores, respectively. (*Id.* at 14-15.) Accordingly, the IEP noted G.M.'s reading and writing needs and, consistent with the 2017 report's conclusion that he exhibited a learning disability and had attention deficit disorder, identified in describing his present levels of performance that G.M. had significant language needs, acknowledged "the impact of his inconsistent attention on his overall performance" and set forth strategies to address it. (*Id.* at 16; Dist. Ex. 11 at 6.) Thus, Plaintiffs' argument that the CSE "completely neglected" the 2017 report is not borne out by the record. (Ps' Mem. at 4; ECF No. 21 ("Ps' Reply Mem.") at 4-7.)

31

Second, Plaintiffs argue that Dr. Dietrich diagnosed G.M. with a specific learning disability with impairment in mathematics, but the CSE did not sufficiently consider G.M.'s math deficits and the program was not sufficient to address them. (Ps' Mem. at 5.) The SRO outlined the CSE's consideration of G.M.'s math needs and its corresponding recommendations. Specifically, the SRO noted that in the IEP, G.M.'s math needs were identified as "understanding the language of math within word problems, solving multi-step word problems, solving multi-digit multiplication and division problems, solving problems with money, and automaticity with his math facts." (SRO Decision at 15-16; *see* Dist. Ex. 11 at 7.) Additionally, the SRO noted that the IEP comments included the Windward liaison's report that G.M. was in a "slower-paced math group," received one session of math tutoring per week at Windward, and "has nice addition calculation skills but needs support with multiplication and division." (SRO Decision at 18; *see* Dist. Ex. 11 at 2.) The SRO explained that the IEP "contained three math annual goals targeting the student's needs in identifying the appropriate operation and steps needed to solve multi-step word problems, identifying the value of mixed dollars and coins, and answering multiplication facts up to 10 times" and also included a speech-language goal of "understanding the language of math by identifying what the question is asking." (SRO Decision at 19; *see* Dist. Ex. 11 at 10.) Accordingly, the CSE recommended 60 minutes per day of ICT services in math, and the IEP included the accommodation of the use of manipulatives and a multiplication chart for math, as Osooli had noted at the meeting that continuing with manipulatives for math would be appropriate due to the multisensory approach G.M. requires. (SRO Decision at 20-21, 25; *see* Dist. Ex. 11 at 8, 11-13.) The basis of the SRO's decision that these services were adequate was well-reasoned, and as a matter of educational expertise, the Court must defer to that conclusion.

*See L.J.B. v. N. Rockland Cent. Sch. Dist.*, No. 22-CV-8474, 2024 WL 1621547, at *8 (S.D.N.Y. Apr. 15, 2024).

Plaintiffs further argue that the SRO gave undue weight to Osooli's "vague and broad statements about the efficacy of [the] ICT class," (Ps' Mem. at 8, 10-11), but the SRO properly relied on Osooli's testimony that there are about six to eight students with IEPs in ICT classes, that the classes allow for small-group instruction and are based on each student's needs, and that there are opportunities for parallel teaching and individualized instruction, (*see* SRO Decision at 21). *See J.S. v. N.Y. City Dep't of Educ.*, 104 F. Supp. 3d 392, 409 (S.D.N.Y. 2015) (concluding that there was "substantial support in the record" for conclusion that ICT class recommended in IEP was appropriate where IHO and SRO considered testimony of school district special education teacher and school psychologist that program was sufficient for student), *aff'd*, 648 F. App'x 96 (2d Cir. 2016).

Lastly, Plaintiffs argue that the IEP failed to reflect the 2017 report's recommendation that G.M. be placed in "a school which specializes in the education of children of at least average intelligence with a language-based learning disability" and in "a program such as Orton-Gillingham" with "multi-sensory instruction . . . throughout the school day." (Dist. Ex. 4 at 19; *see* Ps' Mem. at 8-9.) The IHO reasoned, and the Plaintiffs argue, that the District's recommended program was not appropriate because "[t]he reading instruction . . . was not provided throughout the day and was not the Orton-Gillingham approach specifically designated." (IHO Decision at 35; *see* Ps' Mem. at 9.) But a school has no obligation to follow the recommendation of a private expert. *C.L.K. v. Arlington Sch. Dist.*, No. 12-CV-7834, 2013 WL 6818376, at *10 (S.D.N.Y. Dec. 23, 2013). Further, the SRO properly determined that the CSE was not required to specify a teaching methodology and that the evidence in the record

showed that the totality of the program addressed G.M.'s needs.  "[A] CSE is not required to specify methodology in an IEP," and "[u]nless a specific methodology is required for a student to receive an educational benefit, the choice of pedagogic methodology is appropriately left to the teacher."  *T.C. v. N.Y. City Dep't of Educ.*, No. 15-CV-3477, 2016 WL 1261137, at *14 (S.D.N.Y. Mar. 30, 2016); *cf. M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 257 (2d Cir. 2012) ("In light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, we cannot simply assume that the decision to rely heavily on a single method or style of instruction is necessarily inappropriate.").[14]

The record does not support that only the Orton-Gillingham program would allow G.M. to progress sufficiently in reading, and accordingly, that the IEP did not specifically recommend the Orton-Gillingham program or specialized reading instruction throughout the day did not make the IEP inadequate.  As the SRO noted, in addition to the daily 60-minute session of group specialized reading instruction, the IEP provided ICT services for ELA and math, and three 60-minute sessions weekly of specialized reading during summer 2020 to prevent "substantial regression," and at the impartial hearing, Osooli explained that the reading instruction would use a multisensory approach.  (SRO Decision at 24-25.)  In light of these and other supports and accommodations, the SRO appropriately determined in a well-reasoned manner that the IEP addressed G.M.'s needs, and Plaintiffs have not shown why the SRO's conclusion does not warrant deference.  *See P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 410 (S.D.N.Y. 2017)

---

[14] Furthermore, "[s]o long as the methodologies referenced in the IEP are appropriate to the student's needs, the omission of a particular methodology is not a procedural violation."  *R.B. v. N.Y. City Dep't of Educ.*, 589 F. App'x 572, 576 (2d Cir. 2014) (summary order).  Here, with respect to reading instruction, the IEP provided for specialized reading instruction once daily in a small group throughout the school year, and three times weekly in a small group in July and August 2020 before the commencement of the school year.  (Dist. Ex. 11 at 11, 14.)

(SRO's decision deserves deference where review of record was thorough, considering all evidence presented by parties, and decision was set forth in well-reasoned, detailed opinion).[15]

## B.  The 2021-2022 School Year

With respect to the 2021-2022 school year, Plaintiffs argue that the District failed to offer G.M. a FAPE because the ICT recommendation for all content areas along with a 15:1 education support class did not provide sufficient support in light of his learning deficits.  (*See* Ps' Mem. at 11-19.)

Plaintiffs first contend that the SRO improperly determined that the ICT classes were appropriate for G.M. because the SRO "relied too heavily on testimony from witnesses who were unable to provide specific and concrete information about how the ICT program would address GM's learning needs."  (*Id.* at 15.)  Specifically, Plaintiffs argue that none of the District's witnesses worked in the middle school and that they were unable to provide details about how the middle school would have implemented the IEP.  (*Id.* at 12, 15.)  In considering whether the CSE appropriately recommended ICT services for the 2021-2022 school year, the SRO noted Diaco's testimony that the ICT setting for all subjects would allow G.M. general education while

---

[15] Plaintiffs also assert that the District "failed to establish that the recommended general education classes for science and social studies were appropriate" and "only focused on the appropriateness of the ICT classes for math and language arts."  (Ps' Mem. at 10.)  A review of the transcript for the 2020 CSE meeting reveals that there was only one mention of science and social studies, when Osooli asked G.M.'s private tutor which areas the District should be targeting for his language needs, and she responded, "language arts, but also social studies and science, because he's going to have a lot of difficulty understanding that vocabulary."  (June 2020 Hearing Tr. at 50:8-25.)  The June 2020 IEP does not include particular provisions for science and social studies, (*see* Dist. Ex. 11), and the record does not reflect why the April 2021 IEP expanded ICT to those content areas, (Dist. Ex. 21 at 3).  But given the supports that the 2020-2021 IEP included for G.M.'s reading and comprehension, the passing reference to science and social studies does not suffice to render the IEP inadequate.  *See T.G. ex rel. R.P. v. N.Y. City Dep't of Educ.*, 973 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) ("[A]lthough a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations.").

still being provided specialized instruction, that he would have access to peers who had similar cognitive profiles, and that he would work in small groups with a special education teacher who would provide reteaching in the classroom and during the educational support class.  (*See* SRO Decision at 31 (citing Tr. at 296-99).)  That none of the District's witnesses worked in the middle school does not mean that they were not qualified to testify on behalf of the District about the workings of the ICT program.  Indeed, Diaco noted in her testimony that at the CSE meeting, the District explained what the ICT model would look like with the help of Vanessa Caine, (Tr. at 296:9-17), who Plaintiffs acknowledge was a District middle school guidance counselor but who Plaintiffs also contend was not qualified to explain the ICT classes because she had never worked in an ICT class or taught in a classroom, (Ps' Mem. at 15).  Plaintiffs do not provide any support for the proposition that the ICT program had to be explained by a District representative with hands-on experience with the middle school ICT program.  The District's witnesses were all well credentialed educators deeply involved in special education and there is no reason to doubt their familiarity with the programming offered by their own District.  Furthermore, to the extent Plaintiffs suggest that they were doubtful about how the IEP would be implemented in the middle school, "evaluation [of the program] must focus on the written plan offered to the parents," and "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 195 (2d Cir. 2012).

Plaintiffs also contend that the SRO did not sufficiently consider the fact that the CSE failed to discuss the reasons for G.M.'s progress at Windward, including the student to teacher ratio, how the content-area classes were instructed, and what type of language-based instruction was utilized.  (Ps' Mem. at 17.)  But again, Plaintiffs do not provide support for the argument

that the CSE was required to formally discuss such factors. As the SRO noted, the CSE must consider the results of the initial or most recent evaluation, the student's strengths, the parents' concerns, and the academic, developmental, and functional needs of the student. (*See* SRO Decision at 13 (citing 34 C.F.R. 300.324(a); 8 NYCRR 200.4(d)(2)).) The CSE was not required to explicitly mention the specifics of Windward's program, especially when it had heard from a Windward representative, G.M.'s parents and his private tutor at the meeting.

Third, Plaintiffs argue that Dr. Newman's 2020 evaluation was not sufficiently considered during the CSE meeting. (Ps' Mem. at 17.) But, as the SRO detailed, the IEP included the results and diagnoses in the December 2020 evaluation, and Diaco noted during the meeting that she compared her testing results to the results in that evaluation. (SRO Decision at 26-27.) Thus, the SRO concluded that the record did not support the IHO's finding that the 2020 evaluation was not appropriately reviewed. (*Id.* at 27.) The SRO's conclusion is well-reasoned, and the Court does not find any reason to disturb it.

Plaintiffs also argue that the SRO improperly determined that the IHO erred in finding that G.M. required specialized reading instruction. (Ps' Mem. at 18.) The SRO determined that G.M. did not require such instruction because Dr. Newman's 2020 report did not include such a recommendation, but Plaintiffs argue that this reasoning is flawed because the SRO cited G.M.'s average scores in decoding and fluency but neglected his reading comprehension deficits and need for specialized remediation. (*Id.*) Thus, Plaintiffs argue that the SRO did not consider the "full picture of GM's reading deficits." (*Id.*) But the SRO considered that the 2020 report found G.M. performing in the average range in reading achievement and basic reading skills, and that further reporting from Windward showed that G.M. was progressing in the ability to read fluently. (SRO Decision at 32.) The SRO determined that the April 2021 IEP addressed G.M.'s

reading needs by recommending ICT services, the daily educational support class, and additional

supports and accommodations, and that the record did not establish that he required specialized

reading instruction.  (*Id.*)  The SRO's decision was supported by the evidence and adequately

considered the available evaluative data, and Plaintiffs' contention that the SRO did not consider

the full picture of G.M.'s needs is not supported by the record.

Finally, Plaintiffs contend that the 2021-2022 IEP did not properly address G.M.'s math

deficits and his need for intensive remediation in that subject.  (Ps' Mem. at 16-17.)  On this

point Plaintiffs appear to be on more solid ground.  Between the 2020-2021 and 2021-2022

meetings, both Newman and Needleman tested G.M. and found him performing for almost every

math skill in the bottom 1% and even the bottom 0.1%.  (Dist. Ex. 15 at 14; Dist. Ex. 18 at 2.)

They both concluded that he was at kindergarten to mid-second-grade level.  (*See* Tr. at 214:5-

19; *see* Dist. Ex. 15 at 14.)  It is hard to see, as Plaintiffs point out, (Ps' Mem. at 16-17), how a

student at approximately first-grade level could function in a sixth-grade math class with general

education students.  In light of the extent to which G.M. was behind, the record does not show

how the extra attention that the special education teacher could give in the room and the

educational support class would suffice without additional remediation.  In the classroom, that

teacher would have to assist six or seven other students in addition to G.M., and the forty-minute

support class included fifteen students and covered all subject areas.

The IHO noted that Dr. Newman had diagnosed G.M. with impairment in math and that

Needleman testified that Dr. Newman's report showed that math was difficult for G.M. because

he scored in the low range for fluency and calculation, specifically scoring at a kindergarten or

first grade level for math fluency.  (IHO Decision at 37-38.)  But in deciding that G.M. was not

provided a FAPE for the 2021-2022 school year, the IHO did not separately analyze the

adequacy of the IEP in addressing G.M.'s math needs.  The SRO also did not address this issue.

Without analysis from the IHO and SRO on whether the IEP appropriately addressed G.M.'s

math needs, there is no administrative decision to which the Court can defer.  Accordingly,

because this matter would benefit from the application of educational expertise, the Court

remands this matter to the SRO for consideration in the first instance.  *See W.A. v. Hendrick*

*Hudson Cent. Sch. Dist.*, No. 14-CV-3067, 2017 WL 3066888, at *9 (S.D.N.Y. July 18, 2017)

("[R]emand is appropriate where the district court has received insufficient guidance from state

administrative agencies as to the merits of a case, or where proper resolution of the disputed

issue requires expertise.") (collecting cases), *aff'd*, 927 F.3d 126 (2d Cir. 2019); *FB v. N.Y. City*

*Dep't of Educ.*, 923 F. Supp. 2d 570, 589 (S.D.N.Y. 2013) (remanding matters unaddressed by

SRO to SRO for consideration in the first instance based on "voluminous" administrative

record); *D.N. v. N.Y. City Dep't of Educ.*, 905 F. Supp. 2d 582, 589 (S.D.N.Y. 2012) ("[R]ather

than reaching the merits of the unreviewed claims, [the Court] remand[s] this matter to the SRO,

who is uniquely well suited to review the content and implementation of the Student's IEP.").  If

necessary, the SRO may remand the issue to the IHO for further evidentiary proceedings.  *See*

*Montalvan v. Banks*, 707 F. Supp. 3d 417, 439 (S.D.N.Y. 2023).

### C.    Reimbursement for Private Placement

Because the SRO determined that G.M. was offered a FAPE for the 2020-2021 and 2021-

2022 school years, she did not "need [to] decide whether his unilateral placement at [The

Windward School] was appropriate, or whether equitable considerations favor Plaintiffs' request

for tuition reimbursement."  *E.L. v. Bedford Cent. Sch. Dist.*, No. 18-CV-3062, 2022 WL

3667189, at *20 (S.D.N.Y. Aug. 25, 2022); *see J.B. v. N.Y. City Dep't of Educ.*, 242 F. Supp. 3d

186, 199-200 (E.D.N.Y. 2017) (unnecessary to reach second and third prongs of reimbursement

test where record amply supported SRO's decision that IEP reasonably calculated to provide a

FAPE).  As the SRO did not reach these issues, "I must look to the opinion of the IHO who did

address the issue[s]," *V.A. v. City of N.Y.*, No. 20-CV-989, 2022 WL 1469394, at *12 (E.D.N.Y.

May 10, 2022), and I need not remand to the SRO "when the IHO's determination offers well-

reasoned and persuasive guidance," *id.* at *13.  With respect to the IHO's reasoning, the District

argues, as it did before the SRO, that the IHO erred in determining that Windward was an

appropriate placement for G.M. because the IHO based its determination on Dr. Dietrich's

outdated 2017 evaluation, Windward did not offer any speech and language services, the IHO

ignored evidence that G.M.'s language and math scores dropped during his time at Windward,

there was insufficient evidence that Windward provided necessary services to G.M., the evidence

demonstrated that Windward's program was too restrictive for G.M., and there was no evidence

that the strategies used at Windward to integrate language into subjects other than ELA were not

applied in public school.  (District's Memorandum of Law to SRO at 6-7; Dist. Opp. at 18-24.)

As the SRO did not consider these arguments, and whether placement was appropriate is a

question that requires educational expertise, I remand to the SRO to consider this issue in the

first instance, *see V.A.*, 2022 WL 1469394, at *13, should the SRO conclude that the 2021-2022

IEP did not provide a FAPE as it relates to math.

Additionally, with respect to equitable considerations, the District argues that it acted in

good faith, considered all of the information provided by Plaintiffs and their private school and

providers, and thoughtfully developed an IEP, whereas the parents appeared to agree with the

goals and recommendations of the CSE and then filed a due process complaint raising issues

they had not raised at the CSE meeting.  (Dist. Opp. at 24-25.)  On remand, should the SRO

determine that G.M. was denied a FAPE, the SRO should also determine whether the equities

favor reimbursement.  *See V.A.*, 2022 WL 1469394, at *13; *see also Ferreira v. Aviles-Ramos*,

No. 23-612, 2024 WL 4611106, at *5 (2d Cir. Oct. 30, 2024) (courts should engage in

independent review of administrative record to determine balance of equities, but may consider

IHO and SRO views on equitable considerations for their "power to persuade").

## IV.    **CONCLUSION**

Because the SRO appropriately found that the District offered G.M. a FAPE for the 2020-

2021 school year, Plaintiffs' motion for summary judgment on their request for tuition

reimbursement for that year is denied.  Plaintiffs' motion for summary judgment on their request

for tuition reimbursement for the 2021-2022 school year is granted in part, in that I remand to the

SRO to consider whether the 2021-2022 IEP sufficiently addressed G.M.'s needs as they relate

to math, and if not, whether Windward was an appropriate placement and whether the equities

support Plaintiffs' claim.  The Clerk of Court is respectfully directed to terminate the pending

motion, (ECF No 18), and close the case for administrative purposes only.[16]

**SO ORDERED.**

Dated:  November 15, 2024
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.

---

[16] Should there be another appeal, the appealing party should request by letter that the
Court re-open the case.